**GUNDERSEN MEDICAL FOUNDA-
TION, LTD., Plaintiff,**

**v.**

**The UNITED STATES of America,
Defendant.**

**No. 79–C–51.**

United States District Court,
W. D. Wisconsin.

April 5, 1982.

Kenneth L. Cutler, of Dorsey, Windhorst, Hannaford, Whitney & Halladay, Minneapolis, Minn., for plaintiff.

Thomas R. Jones, Tax Div., U. S. Dept. of Justice, Washington, D. C., for defendant.

OPINION AND ORDER

JAMES E. DOYLE, Senior District Judge.

Following trial to the court and pursuant to Rule 52, F.R.Civ.P., I find those facts set forth hereinafter under the heading "Facts." All references are to the period in suit (1970 through 1974) unless otherwise stated.

*Facts*

1: The plaintiff, Gundersen Medical Foundation Ltd. (the Foundation), is a nonstock corporation organized in 1944 under the laws of Wisconsin with its principal place of business in LaCrosse.

2: The Internal Revenue Service assessed a timely deficiency in income tax against the Foundation for the following years in the following amounts:

| | |
|------|-------------|
| 1970 | $22,207.53 |
| 1971 | $19,152.96 |
| 1972 | $32,649.00 |
| 1973 | $27,567.00 |
| 1974 | $41,790.00 |

3: The Foundation paid the deficiencies and assessed interest, and filed timely Claims for Refund.

4: After the Claims for Refund were denied by the Internal Revenue Service, the Foundation filed this suit on February 7, 1979.

5: In a letter dated June 12, 1946, the Foundation was classified by the Internal Revenue Service to be exempt from federal income tax as an organization described in section 501(c)(3) of the Internal Revenue Code (26 U.S.C.). On August 31, 1976, the Internal Revenue Service issued a ruling that the Foundation's specific status as a tax-exempt organization described in section 501(c)(3) was, as of that date, and had been since October 9, 1969, that of an educational organization within the meaning of section 170(b)(1)(A)(ii) of the Internal Revenue Code. In a letter dated November 2, 1979, months after the Foundation had commenced this action, the Internal Revenue Service revoked its ruling of August 31, 1976; it stated its conclusion that the Foundation was not an educational organization described in section 170(b)(1)(A)(ii) of the Code; and the Service therefore classified

the Foundation as a private foundation under section 509(a) of the Code as of October 9, 1969. However, the Service declared simultaneously that the Foundation's exemption under section 501(c)(3) as a scientific and educational organization remained in effect.

5.1: The exempt purpose of the Foundation is to provide programs of medical education at the technical, undergraduate, postgraduate and continuing medical education levels in LaCrosse, Wisconsin. It is also the purpose of the Foundation to sponsor medical research programs incident to and as a complement to its educational functions.

6: The Gundersen Clinic Ltd. (the Clinic) is a private corporation also located in La-Crosse, Wisconsin. The Clinic is not and never has been a tax-exempt organization.

7: The LaCrosse Lutheran Hospital (the Hospital) is an organization exempt from federal income taxes under section 501(c)(3) of the Code. The Hospital has a capacity of 350 beds.

8: The Foundation owns certain land and buildings in LaCrosse, Wisconsin. The real estate owned by the Foundation is adjacent to LaCrosse Lutheran Hospital.

9: In 1967 the Foundation expanded one of the buildings it owned which housed the Clinic. The cost of this expansion was primarily financed with funds borrowed from the Northwestern Mutual Life Insurance Company. Northwestern Mutual Life Insurance Company holds a mortgage on the Foundation's real property securing that loan.

10: For some time prior to and during the years in suit (1970–1974), the Foundation leased the facilities it owned to the Clinic. The facilities include both the building and the personal property (medical equipment, x-ray equipment and office equipment) in the building.

11: The real estate and personal property are leased by the Foundation to the Clinic at fair market rental value. Two written leases were executed in 1970, one for the real estate and one for the personal

property. The funds generated by the rental payments, after payment of expenses for the equipment and the mortgage, are used to support the Foundation's educational and research programs, and the payment of stipends to residents and interns.

12: The Internal Revenue Service determined that during the years in suit, a certain portion of the lease payments made to the Foundation by the Clinic was unrelated business income under sections 511 and 514 of the Code, and therefore taxable. That is, the position of the Service was that of the Foundation's income from the leased, debt-financed property, a certain portion was unrelated to the exempt function of the Foundation.

13: However, the Service excluded certain amounts of the lease payments from unrelated business income. That is, the Service conceded that a part of the use of the leased premises was substantially related to the Foundation's exempt function and purposes, namely, medical education and research. The percentage deemed to be so substantially related varied with each year in suit as follows:

| Year | Real Property Rents | Personal Property Rents |
|---|---|---|
| 1970 | 22% | — |
| 1971 | 22% | — |
| 1972 | 19.57% | — |
| 1973 | 19.57% | 29.5% |
| 1974 | 19.57% | 34.8% |

14.1: Dr. Edwin L. Overholt was selected by the Foundation in 1968 to serve as its Director of Medical Education and Research. He was specifically charged with expanding and improving the Foundation's educational programs in order to make those programs competitive with other high quality post-graduate medical education programs.

14.2: Among Dr. Overholt's specific responsibilities is the promotion of growth of all of the educational programs. This expansion has occurred.

14.3: In 1970 the Foundation was accredited by the American Medical Association for residencies in surgery, internal

medicine and oral surgery. Five residents were so involved. By 1974, 13 residents were involved in those programs. Stipends for the residents are paid by the Foundation, which is responsible for their selection as students, evaluation of their performance, and the content of their course, and is responsible also for assessing their evaluations of the facility.

14.4: The Foundation selects interns for postgraduate education as well. This program has also been expanded by Dr. Overholt. In 1970 the Foundation selected 11 interns under the matching program set up by the American Medical Association. The Foundation is a party to that matching program. In 1974 the Foundation selected 12 interns. The interns receive most of their education within LaCrosse Lutheran Hospital.

14.5: The Foundation has entered into affiliated residency programs. In 1970 these programs included orthopedics and surgery. By 1974 there were programs in urology and E.N.T. as well as the earlier programs, and 10 residents each year were involved in the programs.

14.6: The Foundation has also entered into agreements with the medical schools of the University of Wisconsin and the University of Iowa for the education of undergraduate medical students. These students take rotations in LaCrosse as part of their undergraduate education. The number of students involved was approximately 10 in 1970, and 100 in 1974.

14.7: The Foundation has also arranged for and funded lectures and discussions of specific patient problems by consultants from various medical institutions. These consultant lectures are made available generally to physicians and other medical personnel in the tri-state area, without charge, as well as to the Foundation's students. During 1970 there were 65 such consultant lectures, and during 1974 there were 90. In addition, the Foundation, through Dr. Overholt, organizes teaching conferences conducted primarily by its faculty (who are Clinic physicians) and by its students. These teaching sessions are attended by the Foundation's faculty and students. Area physicians are also invited to attend without charge. During 1970 there were 26 such teaching conferences per month, and during the 1974–1975 school year there were approximately 50 per month.

14.8: · The Foundation sponsors programs of continuing medical education, accredited by the State Medical Society of Wisconsin and the American Medical Association, at which area physicians could earn necessary continuing medical education credits. These day-long programs are conducted by members of the Foundation faculty as well as by outside experts. In 1970 there were three such symposia, and by 1974 there were four per year.

14.9: The Foundation has entered into agreements with Western Wisconsin Technical Institute to offer paramedical training in numerous areas including: radiologic technician, operating room assistant, medical assistant, medical records technician, medical laboratory technician and medical secretary.

15: The facilities leased by the Foundation are used by the Clinic to treat the Clinic's patients. In 1970, 173,224 patients visited the Clinic for treatment. In 1974, 264,368 patients visited the Clinic.

16: Between 1970 and 1974, the fees the Clinic received from the patients increased from approximately $7,000,000 to $12,000,000. The professional staff of the Clinic increased in number from 72 in 1970 to 108 in 1974.

17: The faculty of the Foundation consists of members of the medical staff of the Clinic. They are paid by the Clinic and not by the Foundation. The outside consultants who lecture are paid by the Foundation.

18: The Foundation's Director of Medical Education is paid by the Clinic and not by the Foundation. The members of the Foundation's education committee are all employed by the Clinic.

19: The Foundation is governed by a Board of Trustees, the majority of whom are individuals from the LaCrosse, Wiscon-

sin area who are not employed by the Clinic. The Board of Trustees is selected by the vote of the members of the Foundation, a majority of whom are not physicians and are not employed by the Clinic. The President of the Board of Trustees is Charles Gelatt, a business executive, who was a member of the Board of Regents of the University of Wisconsin for 27 years, and has also served on the Boards of Trustees of Carroll College and Viterbo College. The degree of control exercised by the Board of Trustees over the Foundation's operations is no less than that exercised by similar boards of other educational institutions.

20: With regard to educational matters, Dr. Overholt is responsible to the Board of Trustees of the Foundation. That Board has the authority to terminate his employment as Director of Medical Education, if necessary, and to select and hire his replacement. In their role as members of the Foundation's faculty, the members of the medical staff of the Clinic report and are responsible to Dr. Overholt as Director of Medical Education, and not to the management of the Clinic. Dr. Overholt reports to the Board of Trustees whenever necessary, and makes a formal annual report concerning the educational programs and the research undertaken. The Board of Trustees has ultimate responsibility for the Foundation's education program including final approval of the Foundation's annual education budget.

21: The entire bundle of medical activity engaged in by the medical staff of the Clinic throughout the building leased by the Foundation, and with the use of the equipment leased by the Foundation and located within the leased building, will be referred to as Bundle A. Included within Bundle A are two sub-classes of medical activity. Bundle A(1) consists of that medical activity engaged in by the medical staff of the Clinic, in which the students of the Foundation do not participate either as actors or observers. Bundle A(2) consists of that medical activity engaged in by the medical staff of the Clinic, in which the students of the Foundation do participate either as actors or as observers. In terms of diagnosis and treatment of patients and related activity, there is no difference in kind between the medical activity engaged in by the medical staff of the Clinic in Bundle A(1) and that in Bundle A(2).

The purpose of the Clinic in engaging in the medical activity by its staff in Bundle A(1) is profit-making.[1] With respect to the medical activity of the Clinic staff in Bundle A(2), both profit-making and the promotion of the education of the students of the Foundation are purposes of the Clinic.

The exclusive purpose of the Foundation in arranging for its students to participate in Bundle A(2) is to provide programs of medical education at the technical, undergraduate, postgraduate, and continuing medical education levels and to sponsor medical research programs incident to and as a complement to the Foundation's educational functions. With respect to the medical activity of the Clinic staff in Bundle A(1), the exclusive purpose of the Foundation is also the promotion of the education of its students, but only by indirection. The scope and variety of the medical activity in all of Bundle A is reflected in the cross-section (Bundle A(2)) in which the Foundation's students participate. The knowledge and skills acquired by the Clinic staff in the course of the medical activity in all of Bundle A is reflected in the teaching which occurs in the course of Bundle A(2). Thus, the quality of the education received by the Foundation's students in the course of their participation in Bundle A(2) is enhanced by the medical activity of the Clinic staff in Bundle A(1). As to neither Bundle A(1) nor Bundle A(2) is profit-making a purpose of the Foundation.

The Foundation does not cause the happening of any part of the medical activity of the staff of the Clinic in Bundle A. The

---

1. Nothing invidious is implied concerning the attitude of the members of the medical staff of the Clinic. No doubt the Clinic does its share of uncompensated service for certain patients. No doubt the staff members find non-monetary satisfaction in the performance of their healing function. In tax cases, the emphasis on profit-making is necessary, however indelicate.

Foundation and the Clinic are both actors who cause the happening of the education of the Foundation's students in the course of their participation in the medical activity of the Clinic staff in Bundle A(2).

21.1: The education of the Foundation's students takes place throughout the facilities of the LaCrosse Lutheran Hospital and throughout the facilities leased by the Foundation to the Clinic. The Foundation's students' clinical education occurs in the course of treatment of patients who come to the Clinic and to LaCrosse Lutheran Hospital. Virtually every part of the facilities leased to the Clinic, including diagnostic, treatment, conference and office areas is used in the educational process, and the Foundation's students are excluded from no part of the facilities leased to the Clinic.

22: Professional liability insurance for the Foundation's students is provided by the Foundation.

23: The large number of patients treated by the Clinic provides an unusual opportunity for medical education. In some respects, the educational possibilities afforded by the availability of a large outpatient clinic are superior to those of a tertiary care institution such as the University of Wisconsin Hospital because of the greater exposure to the wide variety of medical problems, ranging from runny noses to heart surgery, presented in the Clinic.

24: The Foundation's programs make available a wide range of specialization and experience to its students. This education includes opportunities to study in such medical specialties as general surgery, anesthesiology, orthopedic surgery, otolaryngology, ophthalmology, oral surgery, urology, psychiatry, neurology, neurosurgery, obstetrics and gynecology, dermatology, pathology, various clinical laboratories, diagnostic radiology, nuclear medicine, physical and rehabilitative medicine, and radiation oncology.

25: It would not be possible to accomplish the Foundation's exempt purpose of providing medical education in the LaCrosse area without the existence and operation of a large and sophisticated outpatient clinic treating hundreds of thousands of patients, such as the Gundersen Clinic. The Gundersen Clinic is the only one of this type in the LaCrosse area.

### Opinion

Whether correct or incorrect, the theory upon which the United States assessed the deficiencies against the Foundation was comprehensible. That theory is summarized in the following paragraph.

As of 1970 through 1974, the Foundation was correctly classified as exempt from federal income tax as an organization described in section 501(c)(3) of the Code. Among the various purposes which may qualify organizations for exemption under section 501(c)(3), one is recognized in section 170(b)(1)(A)(ii), namely, the purpose of an educational organization which normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on. As of 1970 through 1974, the Foundation was correctly classified, also, as a section 170(b)(1)(A)(ii) educational organization. Under section 514(b)(1)(A)(ii) of the Code, the rent received by the Foundation from the Clinic was exempt from taxation to the extent that use of the leased real and personal property was substantially related (aside from the need of the Foundation for income or funds) to the exercise of the Foundation's section 170(b)(1)(A)(ii) educational purpose. The extent of the use so substantially related to that purpose was comparatively small. The balance of the rent was taxable to the Foundation as income.[2]

The theory summarized in the preceding paragraph remained the theory of the Unit-

---

2. The portion of the rental income determined by the Service to be exempt, classified year by year and as between real and personal property, is shown at finding number 13, above. For brevity, in this opinion I will use the determination for the 1970 real property rental: 22% exempt and 78% nonexempt.

ed States until November 2, 1979, a date which fell about nine months after the present action was commenced, about three weeks after the final pretrial conference, almost exactly on the tentative trial date set at that final pretrial conference, about two weeks prior to a later-selected trial date, and about four weeks prior to the date on which trial was actually held.[3] That is, until at least November 2, 1979, it appeared that the legal issue was the proper definition of the test governing the connection between the use of the leased property, on the one hand, and the purpose of a section 170(b)(1)(A)(ii) organization, on the other, and that the function of the trial was to determine the facts to which that properly defined legal test was to be applied.

But with the Service's November 2, 1979 revocation of its August 31, 1976 ruling, with the filing of its trial brief on the day prior to trial, and in the course of interrogation of witnesses and closing argument at trial, the United States assumed a sharply different position. Not only did the United States urge the court to view the Foundation, as of 1970 through 1974, as a mere private foundation under section 509(a) of the Code. Its written and oral presentation was heavy with innuendo of deceit, to the effect that the Foundation was a sham and that the Foundation's role in expanding the Clinic building in 1967, borrowing funds for that purpose through a mortgage, leasing its real and personal property to the Clinic, and applying the rent to the mortgage note, was designed by both Clinic and Foundation solely to permit the Clinic to evade income taxes to which the Clinic would have been subject had the Clinic borrowed to build, built, and then retired the construction debt. Citing sections 4946(a)(1) and 4941(d)–2(B) of the Code, the United States contended that as a mere private foundation under section 509(a) of the Code, the

Foundation was flatly prohibited from leasing property to the Clinic, "if" the Clinic or any of its stockholders was a substantial contributor to the Foundation.[4] The United States contended that the Foundation's true and only purpose and function were to channel funds. That is, the Foundation's true and only purpose and function were to receive rental payments and donations and, from those receipts, to make payments on the construction mortgage, to purchase medical equipment, and to pay stipends to residents, interns, and outside consultants.

Pressed by the court during closing argument about this shift in stance, counsel for the United States was ambivalent. In its initial post-trial brief, the United States reembraced the theory, summarized above, which had originally underlain the assessment. It asserted that: whether the Foundation was correctly or incorrectly classified as a section 170(b)(1)(A)(ii) educational organization is not material to the defense of this action; the November 2, 1979 revocation of the August 31, 1976 ruling has no bearing on the issue before the court; the correctness or incorrectness of the section 170(b)(1)(A)(ii) classification does not determine to what extent the leased property was being used for exempt purposes; because the November 2, 1979 revocation is really not relevant to the issue before the court, the Foundation cannot contend that the letter resulted in prejudicial surprise; the November 2, 1979 letter has no bearing on the issues before the court; and the November 2, 1979 letter is not material to the basic issue in this case. Yet in the same initial post-trial brief, the United States contended that it is entitled to defend this action on any state of facts which would operate to deny recovery; that the facts are that the Foundation did not have a faculty as required by section 170(b)(1)(A)(ii) of the

---

**3.** The November 2, 1979 revocation letter was to the effect that the August 31, 1976 ruling had been based on only the information contained in a written request by the Foundation, dated May 14, 1976, and that the revocation was prompted by the receipt of other information not disclosed by the Foundation. Without apology, the revocation letter stated that this

additional information had been obtained by the Service during the course of an audit examination conducted between April 19, 1976, and September 8, 1976.

**4.** I believe the reference to section 4941(d)–2(B) was intended to be to 4941(d)(1)(A).

Code; and that the Foundation's articles of incorporation "say absolutely nothing about the Foundation having a faculty, doing any teaching, or being a school." The brief asked rhetorically how, in the face of the evidence, the Foundation can contend that it is a teaching institution.

In its final post-trial brief, the United States appeared to embrace anew the theory which had originally underlain the assessment. For example, urging that Rev. Rul. 463, 1969–2 C.B. 131, is not helpful to this Foundation in the present case, the United States emphasized that that ruling "involved an operating hospital, not an educational foundation." [5] Yet that brief introduced a wholly new formulation of the issue. It contended that the key issue was not the nature of the relationship between the use made of the leased property, on the one hand, and the exempt purpose of the Foundation, on the other. Rather, the United States contended, the focus must be on the reason why the Foundation borrowed money from the Northwestern Mutual Life Insurance Company in about 1967 to expand one of the buildings and to purchase medical equipment. The United States argued: "The key issue, defendant submits is whether the debt resulting from the expansion of the facilities and the purchase of medical equipment was incurred to advance the profit motives of the Clinic or the non-profit purpose of the Foundation."

The point left in doubt by this bewildering presentation is whether the United States is content that the case be decided on the basis that the Foundation was a section 170(b)(1)(A)(ii) organization in 1970 through 1974. Despite its sporadic protestations to the contrary, the United States appears discontent to submit the case solely on this basis. If on this basis the United States

were to fail, it seems that the United States does desire the court to determine that in 1970 through 1974 the Foundation was not a section 170(b)(1)(A)(ii) organization. Once this negative determination has been made, it seems that the United States desires the court to proceed to decide, on one ground or another, either that all the debt-financed rent the Foundation received from the Clinic was taxable or that at least 78% of it was taxable. I will address the issues in the case, both on the assumption that in 1970 through 1974 the Foundation was a section 170(b)(1)(A)(ii) organization and on the assumption that it was not.

### *Foundation assumed to have been a Section 170(b)(1)(A)(ii) organization*

The statutory framework (as of 1970 through 1974) is that a foundation organized and operated exclusively for an educational purpose (section 501(c)(3)) is generally exempt from taxation on its income (section 501(a)), but is nevertheless taxable on its unrelated business income (section 511(a)(1)).[6] Unrelated business income means income from any unrelated trade or business regularly carried on by the foundation (section 512(a)). Unrelated trade or business, in turn, means any trade or business the conduct of which is not substantially related to the exercise or performance by the foundation of the educational purpose constituting the basis for its exemption (section 513(a)). The receipt of certain so-called "passive" forms of income, including rental income, is generally not taxable (section 512(b)(3)). However, if the property from which the rental income is realized is "debt-financed property," the rental income is taxable, unless the property is property "substantially all the use of which is substantially related (aside from the need of

5. I appreciate that an organization may be properly classified as educational for purposes of section 501(c)(3), even though it does not meet all the requirements for classification under section 170(b)(1)(A)(ii). But even section 501(c)(3) requires that the educational organization be organized and operated "exclusively" for that educational purpose. In its trial brief, at trial, and in its initial post-trial brief, the

United States had insisted that plaintiff Foundation's true and only purpose and function were to channel funds and that its educational purpose, if any, was trifling.

6. Many presently irrelevant qualifications and exceptions, contained in the Code, are omitted from the summary contained in this paragraph of this opinion.

the organization for income or funds) to the exercise or performance by such organization of its ... educational ... purpose or function constituting the basis for its exemption under section 501...." Section 514(b)(1)(A)(i). If "substantially all the use" of such property is not so substantially related, the rental income from it is nevertheless free of taxation "to the extent that its use is so substantially related...." Section 514(b)(1)(A)(ii).

In the present case, for the years in question, the leased property was "debt-financed" in the sense that it was property which was held by the Foundation to produce income and with respect to which there was an acquisition indebtedness. Section 514(b)(1). But to the extent that its use was "substantially related (aside from the need of the [Foundation] for income or funds) to the exercise of its ... educational ... purpose or function," which constituted the basis for its exemption under sections 170(b)(1)(A)(ii), 501(c)(3), and 501(a), the property was not "debt-financed," and to that extent the rental income was not taxable.[7]

As a section 170(b)(1)(A)(ii) organization, this Foundation's purpose or function was the purpose or function of an educational organization which normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on. Based upon the findings of fact I have made, above, substantially all the use of the leased real property and personal property was related to the exercise or performance by the Foundation of this section 170(b)(1)(A)(ii) purpose or function.

This is true whether the extent of such use is measured in time or in space. See Treas.Reg. 1.514(b)–1(b)(ii) and (iii). See, particularly, findings 21, 21.1, 23, and 25.

Although the record does not support a finding of fact on the point, there is a suggestion in the briefing and in oral argument at time of trial that the Service may have adopted a spatial test, considering that only the use of the lecture halls was sufficiently related to the Foundation's purpose or function. If so, the spatial test was misapplied, since it is clear that the medical activities of the Clinic's medical staff contributed to the education of the Foundation's students wherever, within the leased space, those medical activities occurred.

However, it is not sufficient that the use was related to the exercise or performance by the Foundation of its exempt purpose or function. The use must have been substantially related. Treasury Regulations aid in defining substantiality. Section 1.514(b)–1(b)(1), which deals with debt-financed income, declares that guidance is to be found in regulations dealing with the definition of unrelated trade or business. That is, a trade or business in which the Foundation might engage directly is analogous, in this respect, to activities which might be engaged in by a lessee in debt-financed property leased by the Foundation. Treas.Reg. 1.513–1(d)(2) provides:

> Trade or business is "related" to exempt purposes, in the relevant sense, only where the conduct of the business activities has causal relationship to the achievement of exempt purposes (other than through the production of income); and it is "substantially related," for purposes of section 513, only if the causal relationship is a substantial one. Thus, for the conduct of trade or business from which a particular amount of gross income is derived to be substantially related to purposes for which exemption is granted, the production or distribution of the goods or the performance of the services from which the gross income is derived must

---

**7.** One would suppose, that "debt financed property" might include all property with respect to which there is an acquisition indebtedness during a taxable year, and that the income from it might be taxable or nontaxable to the exempt organization, depending upon the nature of the relationship between the kind of use made of it, on the one hand, and the exempting purpose, on the other. Not so. The legislative formulation is that despite the presence of acquisition indebtedness, the property is not "debt-financed" if the necessary relationship between the use made of it and the exempting purpose is present.

contribute importantly to the accomplishment of those purposes. Where the production or distribution of the goods or the performance of the services does not contribute importantly to the accomplishment of the exempt purposes of an organization, the income from the sale of the goods or the performance of the services does not derive from the conduct of related trade or business. Whether activities productive of gross income contribute importantly to the accomplishment of any purpose for which an organization is granted exemption depends in each case upon the facts and circumstances involved.

With respect to the use I have labeled as Bundle A(2) in finding 21—medical activity engaged in by the medical staff of the Clinic, in which the students of the Foundation participated either as actors or as observers—the relationship was surely substantial. These medical activities of the Clinic staff were a cause of the development of knowledge and skill among the students, and they were a substantial cause. They contributed importantly to the accomplishment of that purpose of the Foundation.

But with respect to the use I have labeled as Bundle A(1)—medical activity engaged in by the medical staff of the Clinic, in which the students of the Foundation did not participate—the question of substantiality is more difficult. The causative role of the Bundle A(1) activities was real: (a) increasing the skills of, adding breadth and depth to the knowledge of, the teachers; and (b) creating and maintaining a volume and variety of medical activity, a cross-section of which was educationally richer for the students than would have been a cross-section of a smaller, more familiar fare. While real, however, in both respects this causative role was indirect in its impingement on the education of the Foundation's students. Also, a question arises from the size and extent of the Bundle A(1) activities in relation to the nature and extent of the Foundation's educational function. This is a comparison required by Treas.Reg. 1.513–1(d)(3). Although the record in the present case does not permit a precise finding of fact on a comparison between Bundle A(1) and Bundle A(2) in terms of time expended, it would be reasonable to infer that Bundle A(1) is considerably the larger.

The uncertainty with respect to the substantiality of the relationship between Bundle A(1) activities and the section 170(b)(1)(A)(ii) purpose and function of the Foundation is virtually completely removed, however, by reason of examples provided by Congress and the Treasury, and by Treasury rulings.

First, section 514(b)(1) of the Code provides:

> [S]ubstantially all the use of a property shall be considered to be substantially related to the exercise or performance by an organization of its ... educational ... purpose or function constituting the basis for its exemption under section 501 if such property is real property subject to a lease to a medical clinic entered into primarily for purposes which are substantially related (aside from the need of such organization for income or funds or the use it makes of the rents derived) to the exercise or performance by such organization of its ... educational ... purpose or function constituting the basis for its exemption under section 501.

The specificity of Congressional focus on leases by educational organizations to medical clinics is remarkable. Surely Congress foresaw that many of the lessee-medical clinics would be profit-making enterprises. It is unlikely Congress supposed that the students of the lessor-educational organizations would play a role, either as participants or as observers, in every bit of the profit-making medical activity which would occur within the leased premises. Yet nowhere in this specific reference is there recognition of a need to compare Bundle A(1) to Bundle A(2), so to speak. The Congressional language is strongly suggestive that however dominant Bundle A(1) might be in a particular case, "substantially all the use of the property shall be considered substantially related ...."

This express Congressional guidance is echoed in Treas.Reg. 1.514(b)–1(c)(1), relating to leases of real property to medical clinics. The regulation provides an example:

> For example, assume that an exempt hospital leases all of its clinic space to an unincorporated association of physicians and surgeons who, by the provisions of the lease, agree to provide all of the hospital's out-patient medical and surgical services and to train all of the hospital's residents and interns. In this situation, the rents received by the hospital from this clinic are not to be treated as unrelated debt-financed income.

Obviously, it is a hospital rather than an educational foundation which is the lessor in the example, although the training of the hospital's residents and interns by the clinic staff is a close parallel to the training of the Gundersen Foundation's students by the Clinic staff. The truly persuasive point of the example, however, is that there is no qualification expressed concerning the total volume of the medical services provided by the clinic within the leased space, as compared with that portion which is responsive to the needs of the hospital's patients for out-patient medical and surgical services or that portion which is responsive to the hospital's need for training of its residents and interns. That is, so far as the example discloses, it might be that 95% of the use of the leased space consists of rendering medical and surgical services to persons having no connection with the hospital, in which services the hospital's residents and interns have no role either as participants or as observers.

Rev.Rul. 464, 1969–2 C.B. 132, involved facts resembling those in the example just quoted from Treas.Reg. 1–514(b)–1(c)(1). An exempt hospital leased an adjacent, recently-constructed, mortgaged office building to physicians who were members of the hospital's medical staff, so that the physicians could carry on their private medical practices in the leased building. The Service held that the rents received by the hospital were not unrelated business income. Among other factors, the Service noted that the presence of the physicians nearby served to increase their participation in the hospital's medical education and research programs. The Service found no need to determine what portion of the total volume of medical services provided by the lessee-physicians within the leased space was rendered to patients of the hospital. Nor does the report state whether the hospital's residents and interns had a role, either as participants or as observers, in any of the medical activities which occurred within the leased office building.[8]

Fortified by the Congressional language in section 514(b)(1) of the Code and by the administrative construction of the Code, I conclude that substantially all the use of the real and personal property leased by the Gundersen Foundation to the Clinic was substantially related to the exercise or performance by the Foundation of its educational function as a section 170(b)(1)(A)(ii) organization. Section 514(b)(1)(A)(i). Specifically, I conclude that in terms of both time and space, more than 85% of the use of said property was substantially devoted to the exercise or performance by the Foundation of the said educational function. Treas.Reg. 1.514(b)–1(b)(1)(ii).[9]

*Foundation assumed not to have been a Section 170(b)(1)(A)(ii) organization*

In its November 2, 1979 revocation letter, the Service declared that in 1970 through 1974, the Foundation had been a private foundation under section 509(a) of the Code. More explicitly, the Service declared that

---

**8.** In its trial brief, plaintiff cited "Rev.Rul. 69–464, 1969–2 C.B. 132," but related it to a set of facts that appear in Rev.Rul. 463, 1969–2 C.B. 131. In its post-trial brief, plaintiff cited "Rev. Rul. 69–463, 1969–2 C.B. 131." In its final post-trial brief, the United States commented upon "Rev.Rul. 69–463, 1969–2 Cum.Bull. 131." I have examined both Rulings 463 and 464.

Both are relevant and supportive of plaintiff's contention. Ruling 464 is the more persuasive.

**9.** I have examined *Carle Foundation v. United States*, 611 F.2d 1192 (7th Cir. 1979). While not directly apposite, I believe it blesses the method of analysis in which I have engaged.

the Foundation had not normally maintained a regular faculty, as required by section 170(b)(1)(A)(ii) and that it had not presented a course of formal instruction within the meaning of Treas.Reg. 1.170–A–9(b)(1). In the view of the Service the critical fact was that the salaries of the Foundation's director of medical education and research, the members of its education committee, and the members of its faculty were all paid by the Clinic. The correctness of the Service's opinion with respect to section 170(b)(1)(A)(ii) is being assumed: that is, because the Clinic paid the salaries, the faculty was normally maintained by the Clinic rather than by the Foundation, and it was the Clinic which presented the course of formal instruction. The need to define the exempt purpose and function of the Foundation persists, however. The United States contends that the purpose and function were "to channel funds": to receive rental payments and donations and, from those receipts, to make payments on the construction mortgage, to purchase medical equipment, and to pay stipends to residents, interns, and outside consultants.

It is not clear what is implied by the emphasis placed by the United States upon the function of receiving and expending money. This function is universal among exempt organizations, including section 170(b)(1)(A)(ii) organizations. Even in its November 2, 1979 revocation letter, the Service declared that in 1970 through 1974, the Foundation had been a scientific and educational organization under section 501(c)(3).[10] Necessary to this declaration was a determination that the Foundation was "organized and operated exclusively for ... educational purposes ...." Thus, in the eyes of the Service, the exclusivity of its educational purpose and function was not impaired by its function of receiving and expending money. That the Foundation's educational purpose and function may have been too modest and limited to meet section 170(b)(1)(A)(ii) requirements does not mean that they did not exist. They included con-

ducting the programs described in findings 5.1, 14.3, 14.4, 14.5, 14.6, 14.7, 14.8, and 14.9. The selection of the students for those programs and the selection of the outside lecturers was a function of the Foundation. The nature of the course of instruction was determined by the Foundation. In their teaching role, the members of the medical staff of the Clinic reported to and were responsible to the Foundation's director of medical education. Unquestionably, the Foundation played an instigative, perseverant, coalescent role, at a minimum. Central to that role, even when viewed so narrowly, was the arrangement for the Foundation's students, as contrasted with other persons, to receive instruction in the practice of medicine. Clearly, the arrangement was that those students of the Foundation would receive much of that instruction, physically, within the space leased by the Clinic. Therefore, the views I have expressed in the first portion of this opinion apply in full force even if the Foundation was not a section 170(b)(A)(ii) organization.

### The "motives" test

It becomes obvious that the true contention of the United States must be that the test to be applied is not, after all, the presence or absence of a substantial relationship between the use made of the leased space and equipment, on the one hand, and the exempt purpose and function of the Foundation, on the other. The true contention of the United States is that the test to be applied is that stated in its final post-trial brief: "whether the debt ... was incurred to advance the profit motives of the Clinic or the non-profit purpose of the Foundation." This formulation of the test sets abuzz a swarm of questions. It seems to accept that the Foundation was organized and operated exclusively for educational purposes (as it must accept that proposition in light of the position of the Service that the Foundation was a section 501(c)(3) foundation). But the inquiry is not to be direct-

---

**10.** In the following discussion, I will omit the reference to "scientific." The record in this case reveals that in 1970–1974, the scientific program of the Foundation was minor as compared with the educational program.

ed to the nature of the use made of the leased space and equipment. Indeed, it is not the lease, but rather the mortgage loan, which is to be focussed upon. It is not the terms of the mortgage loan, however, but rather the motives of some participant or participants in the loan transaction to which attention is to be directed. Perhaps the emphasis of government counsel on the motives for incurring the debt was inadvertent, and that what is meant is the motives for entering into the whole arrangement, including the mortgage loan and the lease. I will assume so.

Assuming that this Clinic and this Foundation had been strangers to one another, the Service would be indifferent to whether the Clinic had chosen, on the one hand, to borrow to build, built, and returned the debt itself, or, on the other, to rent space and equipment from the Foundation at a fair and competitive rental rate. It was the Foundation, not the Clinic, which benefitted from the arrangement in terms of income taxation. This is exactly what Congress intended, but with one important proviso. For the Foundation to reap the income tax benefit, it was essential that its lessee not be the owner and operator of a macaroni factory (see *C. F. Mueller Co. v. Commissioner*, 190 F.2d 130 (3rd Cir. 1951)), but rather the owner and operator of a medical clinic (or some similar enterprise). From its viewpoint, the Foundation was wise in its choice of a lessee. Had the parties to the lease been strangers, there would be nothing left to say.

This Clinic and this Foundation were by no means strangers in 1944 when the Foundation was formed, in 1946 when the Foundation was granted its status as a section 501(c)(3) organization, in 1967 when the building expansion was launched by the Foundation with borrowed funds, and in 1970–1974 when the debt-financed building and equipment were leased to the Clinic. The true contention of the United States must be perceived, at long last, as a contention that the Clinic and the Foundation were not separate entities during the whole period from 1944 through 1974, but rather were a single functional unit which was not

a non-profit educational unit, but rather a profit-making unit. So viewed, that integrated unit manipulated a tax advantage in 1970–1974 to which it was not lawfully entitled. Although government counsel has stated the test to be "whether the debt ... was incurred [and the lease entered into] to advance the profit motives of the Clinic or the non-profit purpose of the Foundation," what is meant is: "whether, in incurring the debt and entering into the lease, the motives of the Foundation were to win a tax advantage for the persons who controlled a single entity of which the Foundation and the Clinic were integral parts."

Of course, in a given case, an apparently non-profit lessor-foundation may be in truth a profit-making *alter ego* of a profit-making lessee-clinic. The record here does not show that this Foundation was powerless to entertain a motive other than the motives of persons who controlled both the Foundation and the Clinic. No such finding has been requested by the United States. I have found as fact that this Foundation was governed by a board, a majority of whose members were not employed by the Clinic; and that the board was selected by a vote of members, a majority of whom were not employed by the Clinic. Moreover, a finding that the Foundation and Clinic were a single entity, sharing a single set of motives, would contradict the position of the United States in its November 2, 1979 revocation letter and its final post-trial brief: that the Foundation was organized and operated exclusively for educational purposes (Section 501(c)(3)) while the Clinic was not.

I conclude that the applicable test is the substantiality of the relationship between the use made of the leased property and the educational purpose or function constituting the basis for the Foundation's exemption under section 501(c)(3). Applying that test, I conclude that substantially all the use of the real and personal property leased by the Gundersen Foundation to the Clinic was substantially related to the exercise or performance by the Foundation of its educational function as a section 501(c)(3) organization. Section 514(b)(1)(A)(i). Specif-

ically, I conclude that in terms of both time and space, more than 85% of the use of said property was substantially devoted to the exercise or performance by the Foundation of the said educational function. Treas. Reg. 1.514(b)–1(b)(1)(ii).

### ORDER

It is ordered that judgment be entered granting plaintiff the relief sought in its complaint. Counsel for plaintiff are directed to submit a proposed form of judgment not later than April 23, 1982.