**Clyde C. MILLER et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 74-350C(4).**

United States District Court, E. D. Missouri, E. D.

March 24, 1975.

---

Bryan, Cave, McPheeters & Mc-Roberts by Wm. D. Crampton and Juan D. Keller, St. Louis, Mo., for plaintiffs.

Donald J. Stohr, U. S. Atty., St. Louis, Mo. by M. D. Howard, Trial Atty., Tax Div., Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION

NANGLE, District Judge.

This matter comes before the Court upon cross-motions for summary judgment filed by the plaintiffs and the defendant. The plaintiffs, trustees of the Parsons Blewett Memorial Fund, seek a refund of income taxes paid by the Parsons Blewett Memorial Fund to the United States for the Fund's taxable years ended June 30, 1962, through June 30, 1968, in the aggregate sum of $1,017,779.53. Jurisdiction is predicated upon 28 U.S.C. Section 1346(a).

The Court notes at the outset that summary judgment may not be granted if there is any dispute as to any material fact required by the Court for its decision. 6 Moore's Federal Practice par. 56.04[1]. In light of the fact that both parties have moved for summary judgment based on the facts of record, they both obviously agree that there are no material facts in dispute. The Court agrees. The relevant facts not in dispute may be summarized as follows:

On June 13, 1916, Ben Blewett, the Superintendent of Public Instruction of the City of St. Louis, wrote a letter to the City Board of Education proposing to form a Foundation (hereinafter sometimes referred to as "the Fund") by which he and other private individuals might create endowments to assist the teachers of the St. Louis Public Education System. Among other things, Mr. Blewett proposed that the trustees of the Fund be composed of (1) the Superintendent of Instruction of the St. Louis Public Schools; (2) the Secretary and Treasurer of the Board of Education; (3) the Comptroller of the City of St. Louis; (4) a citizen appointed for a term of four years by the judge of the St. Louis Probate Court, and (5) a member of the teaching corps of the St. Louis Public Schools elected by that

corps for a term of two years. On July 11, 1916, the Board of Education of the St. Louis Public School System unanimously adopted a resolution submitted to the Board by a Special Committee appointed to consider the Ben Blewett fund proposal.

The resolution, in pertinent part, stated:

> We thus place on record this expression of our sense of hearty admiration and honor for the great and beneficent purpose so generously expressed by Mr. Blewett and our congratulations to him on possessing the wisdom and philanthropic spirit so exhibited;
>
> . . .

In addition, the resolution approved of the Superintendent and Secretary-Treasurer of the Board serving on the Board of Trustees of the Fund.

On August 4, 1916, Mr. Blewett executed an Indenture of Trust creating a Foundation entitled "The St. Louis Public Schools Foundation for the Relief of Distress and the Advancement of Professional Training". On or about the same date, Mr. Blewett established under the Foundation its first fund entitled "The Jessie Parsons Blewett Fund—A Memorial to my Honored and Beloved Wife and to Her Parents, Charles Bunyan Parsons and Jane Elizabeth Parsons". Mr. Blewett funded the Foundation with $100.00 in cash. He contributed to the fund established in his wife's name stock with an approximate value of $50,000.00.

Shortly after the establishment of the Foundation by Mr. Blewett, he died. Thereafter, on May 20, 1918, Mr. Blewett's sisters, Lucy H. Blewett and Avis H. Blewett, created another Fund to be controlled by the Board of Trustees of the Foundation. The new Fund was entitled "The Ben Blewett Fund". Mr. Blewett's two sisters contributed $15,000.00 in cash to the corpus of the "Ben Blewett Fund".

In 1947, the Trustees of the Foundation received stock having a then fair market value of $1,048,718.00 from the Estate of Ben Blewett.

The abovementioned contributions to the Foundation (or its funds) were as follows:

| | | |
|---|---|---|
| 1916 | Ben Blewett | $ 100.00 |
| 1916 | Ben Blewett stocks | 50,000.00 |
| 1918 | Lucy and Avis Blewett—cash | 15,000.00 |
| 1947 | Ben Blewett Estate—stocks | 1,048,718.00 |
| | Total through 1969 | $ 1,113,818.00 |

The record does not reflect any other contributions to the Foundation (or its funds) through 1969. Thus, the only contributions to the Fund up to and including the years in suit were from Mr. Blewett, his estate, or his immediate family.

On or about June 16, 1950, the Circuit Court of the City of St. Louis, Missouri, ordered that the Trustees consolidate the foregoing separate funds into a single fund to be known as "The Parsons Blewett Memorial Fund".[1] It appears that dividends and interest from various securities were the sole sources of income for the Fund during the life of the Fund. From June 30, 1951, through and including June 30, 1968, the Fund had total receipts from dividends and interest in the amount of $2,700,301.00. During the same period, it paid out $777,811.00 for the relief and aid of retired teachers; $680,832.00 for the scholarship aid; and $160,619.00 for administrative costs. The Fund had, therefore, accumulated over $1 million ($1,081,039.00) in excess funds from June, 1951, through June, 1968. When the accumulations of income during the period June 30, 1951, through June 30, 1968, were added to prior income accumulations of the Fund, the total in-

1. Hereinafter the August 14, 1916 trust and the funds governed by its terms will be referred to as the Fund, whether before or after the 1950 consolidation.

come accumulated as of June 30, 1968, was $1,554,357.00.

On September 5, 1968, the Internal Revenue Service retroactively revoked the Fund's tax exempt status effective June 30, 1962, and assessed $749,313.62 in taxes and $268,526.63 in interest, for a total of $1,017,840.25.[2] The Internal Revenue Service asserted the Fund has unreasonably accumulated funds in violation of Internal Revenue Code Section 504(a)(1). The Fund paid the taxes and assessed interest. A refund claim was then timely filed and disallowed. This lawsuit followed.

For purposes of this lawsuit, the Fund has conceded that if Section 504(a)(1) applies to the Fund, then the Fund did in fact accumulate income which was unreasonable in amount or duration in order to carry out the charitable, education, or other purpose or function constituting the basis for the Fund's exemption under the appropriate Internal Revenue Code Sections. (Internal Revenue Code, Sections 501(a) and 501(c)(3).) Thus, the threshold question here is whether the Fund is subject to the provisions of Internal Revenue Code Section 504(a)(1).

Section 504 of the Internal Revenue Code of 1954, which was repealed by Section 101(j)(5) of the Tax Reform Act of 1969, P.L. 91–172, 83 Stat. 487, imposed a penalty of the loss of tax exemption for any charitable fund or foundation (more specifically, any entity which is exempt under Section 501(c)(3)) that unreasonably accumulated its income. Section 504 by its terms however, only applies to organizations which are exempt under Section 501(c)(3) and to which Section 503 is applicable. Neither the Fund nor the Government has questioned whether the Fund is a Section 501(c)(3) organization. Indeed, it was under this very

Code Section that the Fund was granted its original tax exemption. It remains, however, to determine whether Section 503 applies to the Fund. For, if it does not, then by the terms of the Internal Revenue Code, the unreasonable accumulation provisions of Section 504 cannot apply to the Fund.

Section 503(b)(2) in relevant part reads as follows:

> (b) *Organization to which section applies.*—This section shall apply to any organization described in section 501(c)(3) . . . *except—*
>
> \*  \*  \*  \*  \*  \*
>
> (2) an educational organization *which normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on;*
>  . . . (Emphasis added).

It was under this exception from the rather broad coverage of Section 503 (and thus Section 504) which the Fund claims it falls. This Court is convinced that under the facts of this case, the fund is not a Section 503(b)(2) organization nor can the Fund legitimately claim it is the type of organization Congress intended to be covered by the provisions of Section 503(b)(2).

This Court is not unmindful of the fact that the Fund, over the years, has expended a considerable amount of money for scholarships for teachers of the Public School System of St. Louis. Neither is the Court unmindful of the fact that during the years the Fund sponsored numerous research and study projects which were no doubt helpful to both the teachers and the students in the St. Louis School System.

The Court is likewise aware of the fact that, over the years, the Fund has

---

2. It should be noted that the Fund's complaint prays for the recovery of $1,017,779.-53 rather than the amount set out above. The defendant's answer, however, admits that $1,017,840.25 was the total amount of

taxes and interest assessed and paid by the Fund for the years in suit. No explanation is given for the Fund's failure to claim the difference of $60.72.

expended funds for the relief and aid of teachers and retired teachers in need of financial assistance. Each of these factors, however, simply points to the conclusion that the Fund is operated for charitable or educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code. None of the factors mentioned above, nor the record as a whole, supports the conclusion that the Fund is an educational organization as it is defined in Section 503(b)(2).

The Fund, no matter how charitable or educational its purposes may be, simply and plainly lacks the essential elements required by Section 503(b)(2). The Fund does not normally maintain any faculty or curriculum. Neither does the Fund have the "regularly enrolled body of pupils or students in attendance" as contemplated by the statute. Likewise, the Fund does not have a place where educational activities contemplated by Congress are carried on. In short, the Fund does not have any of the four elements which Congress has specified must be present in order to be considered a Section 503(b)(2) organization.

The presence of the four factors (faculty, curriculum, students, a location) are clearly required by the statute before an organization can be considered a Section 503(b)(2) organization. If this was the sole argument made by the Fund, it is clear that the Fund's claim to being a Section 503(b)(2) organization must be rejected based on the clear and unambiguous terms of the statute. The Fund, however, raises a further argument.

In essence, the Fund's argument seems to be that, although in and of itself the fund may not meet the requirements of a Section 503(b)(2) organization (which it never specifically concedes), the Fund somehow is an integral part of a Section 503(b)(2) organization and is, therefore, entitled to the coverage of Section 503(b)(2). The Court is of the opinion that this further argument has no basis in *fact*.

The Court has read all of the pertinent authority cited by the Fund in support of its proposition that a body of law exists which makes "it clear that if an entity carries out a function appropriate to a 'educational organization' and in support of it, either singly or in association with other like organizations, it is considered an integral part thereof, and entitled to the exemption accorded such an organization as defined in section 503(b)(2)". This Court finds no support for the allegation that the abovementioned "body of law" exists.

The Fund has cited Squire v. Students Book Corp., 191 F.2d 1018 (C.A.9, 1951) and Hospital Bureau of Standards and Supplies, Inc. v. United States, 158 F. Supp. 560, 141 Ct.Cl. 91 (1958) in support of its "integral part thereof" argument. These cases do not involve the question of whether an organization falls within the specific requirements of Section 503(b)(2) or any of its predecessor statutes. Rather, these cases involve the broadly phrased terms of Section 101(6) of the 1939 Internal Revenue Code; and, of course, Section 101(6) contains substantially the same language as Section 501(c)(3) of the 1954 Internal Revenue Code.

There is little doubt that the Fund serves charitable or educational purposes as those terms are used in Section 501(c)(3). But, merely carrying on charitable or educational purposes within the meaning of Section 501(c)(3) does not also make the Fund an "educational organization" as defined in Section 503(b)(2). Congress was specific when it enacted Section 503(b)(2).

The third case cited by the Fund is Brundage v. Commissioner of Internal Revenue, 54 T.C. 1468 (1970) Acq. 1970–2 C.B. XIX.[3] It should be noted

---

3. The Court notes that the Commissioner conditioned his acquiescence in the *Brundage* case. His acquiescence was in result only. The Commissioner explains in 1970–2 C.B. at XIX that acquiescence "in result only" means acceptance of the decision of the Court but disagreement with some or all of the reasons assigned for the decision.

that both the Fund and the Government have cited the *Brundage* case in support of their respective positions. The Court is of the opinion that *Brundage* clearly lends more support to the Government's position than it does to the Fund's.

In *Brundage,* the question was whether the M. H. de Young Memorial Museum was an "educational organization" as defined by Section 503(b)(2). The Government in the *Brundage* case conceded that the museum was "educational" in the broad sense in which that term is used in Section 501(c)(3) (p. 1471). The Government in the instant case has not raised an issue as to whether the Fund is "educational". This is not to say it could not have raised it. Thus, to the extent that in neither the *Brundage* case nor in the instant case has the Government questioned whether the specific entity under review was "educational", the Government's position in the two cases is identical. The Government in *Brundage* apparently took the position that the term "educational organization" as defined in Section 503(b)(2) should be read so as to include only schools, colleges, and universities. The Tax Court in effect rejected this position and this Court expresses no opinion on that point as the Government has not raised it as an argument in this case.

The reasoning in the *Brundage* decision is not completely clear. But, it is clear from the decision that, unlike the situation in the instant case, the Tax Court was *not* confronted with a situation where the questioned organization had none of the four Congressional requirements of a Section 503(b)(2) organization. Moreover, unlike the instant case, the museum in *Brundage* had a regular faculty, a curriculum, a regular enrollment program of students, and actual classes taking place at the museum. Thus, the only question which the Tax Court was confronted with—and, accordingly, actually decided—was whether the museum was an "educational organization" within the meaning of Section 503(b)(2). Here, the basic question of whether the Fund is an "educational organization" *plus* the questions of the existence of the four Section 503(b)(2) factors are raised. Obviously, the Fund cannot fulfill the requirement of the four Section 503(b)(2) factors—faculty, curriculum, etc. Accordingly, this Court need not reach the question of whether the Fund is an "educational organization" within the meaning of Section 503(b)(2). Indeed, it is clear that an organization which fails to comply with the four Section 503(b)(2) factors cannot claim the shield of a Section 503(b)(2) "educational organization".

█ Nevertheless, in an effort to give full consideration to every question raised by the Fund, this Court will take the Fund's argument one point further. That is, even assuming the theory of being "an integral part of" a Section 503(b)(2) organization might possibly apply to bring the Fund under the coverage of Section 503(b)(2) despite the fact that the Fund has no faculty, curriculum, etc., this Court finds that the Fund is not an "integral part of" the Public School System of St. Louis.

Webster's New World Dictionary defines the word "integral" as meaning "necessary for completeness; essential". In turn, that same dictionary defines the word "essential" as meaning "necessary to make a thing what it is; indispensable". The same dictionary defines "necessary" as meaning "cannot be dispensed with".

Plaintiffs would define "integral" as ". . . of, relating to, or serving to form a whole: essential to completeness: organically joined or linked: CONSTITUENT, INHERENT: . . . formed as a unit with another part . . . 2a: composed of constituent parts making a whole: COMPOSITE, INTEGRATED (a hospital, a medical school, and a laboratory of science all taken in one [integral] group . . .)

. . .

It would seem strange indeed that, if the Fund and the uses to which its in-

come is put were either necessary, or essential, or serving to form a whole or constituent, or indispensable to the efficient functioning of the Board of Education, the Missouri Constitution would prohibit the use of state money for the very purpose to which the Fund applies its income. The Fund points out in its brief that Article IV, Section 47 of the Missouri Constitution of 1875, even as amended on November 3, 1936, prohibits the use of public funds for the relief of present or past employees of the state or its political subdivisions. The relief of present and past employees of the St. Louis Public School System, however, is a major function of the Fund.

The Fund also points out in its brief that (pg. 15):

> Of course, there has never been Missouri Constitutional or statutory authority allowing the State or its subdivisions to make payments for the extraordinary relief and aid to any teacher or retired teacher in dire need, nor are Public Schools empowered by statute to grant scholarships or loans to teachers for advanced training which will benefit the educational system. With the exception of the Financial Assistance Program (for undergraduate students) (S.B. 613, 76th Gen.Assy., 2d Sess. 1974) and the funds established by Sections 172.400 and 172.611–1(5) R.S.Mo. (1969), there never has been any Missouri statutory authority for the use of public funds or school funds (the latter being collected and disbursed under Chapters 165 and 166, R.S.Mo. (1969) for scholarships to any individual, and certainly not for post-baccalaureate studies for teachers.

This Court has found nothing to contradict the above statement found in the Fund's brief. Thus, by the Fund's own admission, neither the School Board nor the State could use either of their incomes for the purposes to which the Fund puts its income. The Parsons Blewett Memorial Fund and the uses to which its funds are put cannot possibly be necessary or essential, or indispensable to the School Board's functions, when neither the people of the State of Missouri, nor their elected state representatives have seen fit to consider them so—and, in fact, have prohibited state funds from being spent for the very things which the Fund's income must be spent.

In simple terms, as this Court interprets the word "integral", the Fund is not an integral part of the Public School System of St. Louis. It is clearly helpful to the Public School System of St. Louis and to its teachers but this falls short of being an "integral" part thereof.

The fact that two of the five trustees of the Fund are also members of the School Board of St. Louis, hardly strengthens plaintiff's position. Undoubtedly, the Fund attempts to accommodate the wishes of the School Board, but the fact remains that the Fund is a separate entity which is under no legal compulsion to do anything other than follow the trust's guidelines as set out by Mr. Blewett when he established the Fund in the early 1900's. This Court cannot presume that those trustees who are members of the School Board would violate their fiduciary obligations as trustees for the purpose of subjecting the Fund to every whim of the School Board.

The Fund has cited the Court various Revenue Rulings of the Commissioner in support of its 503(b)(2) arguments. Suffice it to say that none of the rulings cited deal with the Code Section which is the subject matter of this lawsuit.

The Fund can hardly claim any prejudice by virtue of this application (or rather non-application) of Section 503(b)(2) to it. It is common knowledge that Revenue Rulings issued by the Commissioner are limited to the specific factual situations stated in the rulings and, moreover, do not have the standing of law in the way regulations do. Each of the rulings cited by the Fund is clearly distinguishable from the instant case. None of the rulings cited

involve any construction or application of Section 503(b)(2). Put in the context of the Revenue Rulings cited, the denial of plaintiff's claim here puts it in the same position as all similarly situated taxpayers.

■■ The Fund makes one last argument which must be dealt with by the Court. It claims that, if it is not found to be a Section 503(b)(2) organization, then it really makes no difference because none of its income can be considered gross income for tax purposes as all of its income is covered by Section 115 of the Internal Revenue Code of 1954. The pertinent part of Section 115 reads as follows:

> SEC. 115. *Income of states, municipalities, etc.*
>
> (a) *General Rule.*—Gross income does not include—
>
> (1) income derived from . . . the exercise of any essential governmental function and accruing to a State or Territory, or any political subdivisions thereof, . . .

The Fund, in this argument, as it did with its Section 503(b)(2) arguments, is asking this Court to stretch the coverage of the tax statutes well beyond the clear intent of Congress. Section 115 was clearly meant to apply to state and various local governments. To hold that the income of a trust fund which was established by an individual to distribute money to various employees and former employees of a school system, in the circumstances of this case, is excludable from gross income under Section 115 would be ignoring reality. In the circumstances of this case, the Fund's income is obviously not *derived* from the exercise of any governmental function. Neither does the Fund exercise any *essential* governmental function. In addition, none of the income of the Fund *accrues* to a state, territory, or any political subdivision thereof.

The Fund claims that Revenue Ruling 71–589, 1971, 2 C.B. 94 supports its position that its income is excludable from gross income under Section 115. The factual situation of that ruling is clearly different from the factual situation in the instant case.

This Court is of the opinion that plaintiffs' contention that the Fund's income is excludable from gross income under Section 115 is of no merit. See generally, Jamestown & Newport Ferry Co. v. Commissioner of Internal Revenue, 41 F.2d 920 (C.A.1, 1930); Maryland Savings-Share Insurance Corp. v. United States, 308 F.Supp. 761 (Md. 1970), rev'd on other grounds, 400 U.S. 4, 91 S.Ct. 16, 27 L.Ed.2d 4 (1970); and Omaha Public Power District v. O'Malley, 232 F.2d 805 (C.A.8, 1956).

This memorandum opinion constitutes the Court's findings of facts and conclusion of law. In light of the foregoing, the plaintiffs' motion for summary judgment is denied and the defendant's motion for summary judgment is granted. Judgment will be entered accordingly.