# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-3189

_____

Mayo Clinic, a Minnesota Corporation

*Plaintiff - Appellee*

v.

United States of America

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: October 20, 2020
Filed: May 13, 2021

_____

Before SMITH, Chief Judge, LOKEN and GRUENDER, Circuit Judges.

_____

LOKEN, Circuit Judge.

Mayo Clinic ("Mayo"), a Minnesota nonprofit corporation, oversees healthcare system subsidiaries and operates the Mayo Clinic College of Medicine and Science ("Mayo College"). Mayo is a tax-exempt organization under Section 501(c)(3) of the

Internal Revenue Code (IRC), 26 U.S.C. § 501(c)(3).[1] After an audit in 2009, the Internal Revenue Service concluded that Mayo owed unrelated business income tax ("UBIT") on certain investment income it received from the investment pool it manages for its subsidiaries. The IRS issued a Notice of Proposed Adjustment and reaffirmed its position in a 2013 Technical Advice Memorandum. At issue is $11,501,621 in UBIT for tax years 2003, 2005-2007, and 2010-2012. Mayo[2] paid the tax and brought this refund action.

The issue, briefly stated, is whether Mayo is a "qualified organization" exempted from paying UBIT on "unrelated debt-financed income" under IRC § 514(c)(9)(C)(i). Qualified organizations include "an organization described in section 170(b)(1)(A)(ii) . . . ." Section 170(b)(1)(A)(ii) describes "an educational organization which normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on." The IRS denied Mayo the exemption because it is not an "educational organization" as defined in 26 C.F.R. § 1.170A-9(c)(1), that is, an organization whose "primary function is the presentation of formal instruction" and whose noneducational activities "are merely incidental to the educational activities." Ruling on cross motions for summary judgment, the district court held that the Treasury Regulation is invalid "because it adds requirements -- the primary-function and merely-incidental tests -- Congress intended not to include in the statute." Mayo Clinic v. United States, 412 F. Supp. 3d 1038,

---

[1]This opinion traces the evolution of the IRC over more than a century. Unless specified in the text, we refer to the Revenue Code as of the date of this dispute.

[2]The taxpayer for refund years 2003 and 2005-07 was the Mayo Foundation, which merged with Mayo Clinic Rochester in 2010. Mayo, the plaintiff in this case, is the successor by merger to the Mayo Foundation and was the taxpayer for refund years 2010-2012. The reorganization is irrelevant to the issues on appeal.

1042 (D. Minn. 2019). The court granted judgment for Mayo, concluding it is an educational organization as defined in the statute.

The United States appeals, arguing, first, the Treasury Regulation is a valid interpretation of the statutory term "educational organization," whether that term is considered unambiguous (as both parties contend) or ambiguous; and second, applying the regulation, the government is entitled to summary judgment because Mayo is not an educational organization as a matter of law. We review the interpretation of the IRC and Treasury Regulations *de novo*. Mayo Found. for Med. Educ. & Rsch. v. United States, 568 F.3d 675, 676 (8th Cir. 2009), aff'd, 562 U.S. 44 (2011). We conclude the regulation is valid, but only in part, and that application of the statute as reasonably construed by the regulation to Mayo's tax years in question cannot be determined as a matter of law on this summary judgment record. Accordingly, we reverse and remand.

## I. The Regulation's Validity

The principal question on appeal is whether the Treasury Regulation at issue is a valid interpretation of complex, interwoven provisions of the Internal Revenue Code. Our analytical path to resolving this difficult question is well established:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, applying the ordinary tools of statutory construction, the court must determine whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. But if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. . . . [T]he question . . . is always, simply, *whether the agency has stayed within the bounds of its statutory authority*.

City of Arlington v. FCC, 569 U.S. 290, 296 (2013) (quotations omitted; emphasis in original); see Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842 (1984); cf. Kisor v. Wilkie, 139 S. Ct. 2400, 2416 (2019).  The Supreme Court has expressly held that judicial review of Treasury Regulations is governed by this "uniform approach."  Mayo Found., 562 U.S. at 55.

"Generally speaking, the language in the Revenue Act, just as in any statute, is to be given its ordinary meaning."  Commissioner v. Brown, 380 U.S. 563, 571 (1965) (Clay Brown).  As with other complex statutes, words in the IRC are read in the context in which they are used and in the context of the statute as a whole.  It is often essential to understand "the regulatory background against which a [tax statute] was enacted" to determine "the limited nature of the problem the provision was enacted to address."  United States v. Quality Stores, Inc., 572 U.S. 141, 151 (2014).  "Treasury Regulations interpreting the Internal Revenue Code are entitled to substantial deference."  Mayo Found., 568 F.3d 675, 679 (8th Cir. 2009), aff'd, 562 U.S. 44 (2011).

We first set forth the relevant portions of the statute and regulation at issue:

26 U.S.C. § 170(b):
**(1) Individuals.** . . . the deduction provided in subsection (a) shall be limited as provided in the succeeding subparagraphs.
    **(A) General rule.** -- Any charitable contribution to --
        **(ii)** an educational organization which normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on;
        **(iii)** an organization the principal purpose or functions of which are the providing of medical or hospital care or medical education or medical research . . . .

shall be allowed to the extent that the aggregate of such contributions does not exceed 50 percent of the taxpayer's contribution base for the taxable year.

26 C.F.R. § 1.170A-9:

**(c) (1) Educational organization**. An educational organization is described in section 170(b)(1)(A)(ii) if its primary function is the presentation of formal instruction and it normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on. . . . It does not include organizations engaged in both educational and noneducational activities unless the latter are merely incidental to the educational activities. . . .

Section 170 permits a tax deduction for charitable contributions made to certain organizations. Subsection (b) allows a deduction up to "50 percent of the taxpayer's contribution base" for contributions to some organizations ("50% limit organizations"), including organizations listed in § 170(b)(1)(A)(ii). Meanwhile, "other contributions" are limited to "30 percent of the taxpayer's contribution base." IRC § 170(b)(1)(B)(i). This includes a contribution to or for the use of an organization "organized and operated exclusively for religious, charitable, . . . or educational purposes." IRC § 170(c)(2)(B). Section 170(b)(1)(A)(ii) limits the enhanced deduction to contributions to educational organizations that meet its criteria of faculty, curriculum, students, and place. This does not include all organizations that engage in tax exempt educational activities. See IRC §§ 501(c)(3), 170(c)(2)(B).

In concluding that Treasury Regulation § 1.170A-9(c)(1) invalidly adds conditions Congress did not intend, the district court primarily relied on the established principle that, "[w]hen Congress includes particular language in one section of a statute but omits it in another -- let alone in the very next provision -- this Court presumes that Congress intended a different meaning." Loughrin v. United States, 573 U.S. 351, 358, (2014) (cleaned up), quoting Russello v. United States, 464 U.S. 16, 23 (1983). Comparing the two classes of 50% limit organizations in

-5-

subsections (ii) and (iii), the district court determined that under the <u>Russello</u> principle, Congress unambiguously intended to exclude from subsection (ii) the primary purpose or function test it included in subsection (iii).

"In determining whether a particular regulation carries out the congressional mandate in a proper manner, we look to see whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose." <u>Nat'l Muffler Dealers Ass'n v. United States</u>, 440 U.S. 472, 477 (1979).[3] To determine whether the statute the agency interpreted is unambiguous, we turn to the statutory history and other "traditional tools" of statutory construction. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." <u>Davis v. Mich. Dept. of Treasury</u>, 489 U.S. 803, 809 (1989). Although relevant, the <u>Russello</u> principle is not controlling, and we conclude the district court failed to give sufficient consideration to the origins of the statutory charitable exemption and the Treasury Regulation at issue, and the manner in which the current statutory provisions have been added to the IRC and modified over more than a century.

## A. The Statutory Evolution.

(1) "Charitable uses," broadly defined, are protected by the common law as adopted in the United States and "are favorites with courts of equity." <u>Ould v. Wash. Hosp. for Foundlings</u>, 95 U.S. (5 Otto) 303, 313 (1877); <u>see also</u> <u>Vidal v. Girard's Ex'rs</u>, 43 U.S. (2 How.) 127, 191-96 (1844) (origins in common law). Not surprisingly, when Congress enacted a corporate income tax in the ill-fated Wilson-Gorman Tariff Act of 1894, it exempted from the tax "corporations, companies or

---

[3]In <u>Mayo Found.</u>, 562 U.S. at 53-58, the Court concluded that <u>Chevron</u> rather than <u>National Muffler</u> provides the appropriate framework for evaluating an agency regulation interpreting an ambiguous statute. Here, we look to origin and purpose to determine whether a regulation validly interprets a statute's unambiguous command.

associations organized and conducted solely for charitable, religious or educational purposes." Revenue Act of 1894, ch. 349, § 32, 28 Stat. 509, 556.[4] The Revenue Act of 1909 included an indirect excise tax on the income of corporations but likewise exempted:

> any corporation or association *organized and operated exclusively for religious, charitable, or educational purposes*, no part of the net income of which inures to the benefit of any private stockholder or individual.

Pub. L. No. 61-5, ch. 6, §38, 36 Stat. 11, 113 (emphasis added). Though Congress has made many additions and changes to the exemption, this limiting language has been included in every corporate income tax statute for more than a century, most importantly, in § 101(6) of the Revenue Act of 1939, Pub. L. No. 76-1, ch. 2, 53 Stat. 1, 33 ("the 1939 Code"), and in IRC § 501(c)(3), which today provides a charitable exemption from the corporate income tax for "[c]orporations, and any community chest, fund, or foundation organized and operated exclusively for religious, charitable . . . or educational purposes . . . ." See IRC § 501(a) ("An organization described in subsection (c) . . . shall be exempt from taxation").

Another essential component of the IRC, the deduction for charitable contributions by individual taxpayers, was added in the wartime Revenue Act of 1917. The Act extended the income tax on corporations with the above-quoted exemption and, in extending the income tax on individuals, added a deduction for contributions to organizations "organized and operated exclusively for religious,

---

[4]The 1894 Act was struck down in Pollack v. Farmers' Loan & T. Co., 157 U.S. 429 (1895), because it included an unapportioned "direct" tax on property barred by Article 1, § 9 of the Constitution, as well as a valid "indirect" tax on trades and employment. This problem was resolved when the Sixteenth Amendment, ratified in 1913, gave Congress "power to lay and collect taxes on income, from whatever source derived." See generally Brushaber v. Union Pac. R.R., 240 U.S. 1 (1916).

charitable, or educational purposes." Revenue Act of 1917, Pub. L. No. 65-50, ch. 63, § 1201(2), 40 Stat. 300, 330. Again, though there have been other modifications to this deduction, Congress has used this same limiting language to define deductible charitable contributions in every individual income tax statute for more than a century, including in § 23(o)(2) of the 1939 Code, 53 Stat. at 14, and in IRC § 170(c)(2)(B)-(D) today.

The legion of cases applying these early statutes focused, not surprisingly, on the proper meaning of the term "organized and operated exclusively for religious, charitable, or educational purposes." One question -- relevant to the issue in this case -- was rather quickly resolved. It is sufficient if a corporation's activities fall partly within two exempt classifications, "provided the whole of its activities may be included under these two classifications." De Forest v. Commissioner, 19 B.T.A. 595, 599 (1930); accord Book Agents of Methodist Episcopal Church, South v. Hinton, 21 S.W. 321, 324 (Tenn. 1893). This principle is now expressly reflected in 26 C.F.R. § 1.501(c)(3)-1(d)(1)(iv), the Treasury Regulation for IRC § 501(c)(3).

Beyond that, early federal income tax cases mirror fact-intensive state property tax decisions regarding whether a corporation or association was "organized and operated exclusively for religious, charitable, or educational purposes." A consensus emerged that the word "exclusively" should not be interpreted literally if the purposes underlying income tax exemptions and charitable deductions were to be achieved, because every organization has some noncharitable activities. Many of the opinions used words now found in the Treasury Regulation at issue: "The general or predominant purpose is principally to be considered." Turnure v. Commissioner, 9 B.T.A. 871, 874 (1927). "The payment of these amounts was merely incidental to and was a means of furthering the charitable and educational purposes for which the petitioner was organized." Baker v. Commissioner, 40 B.T.A. 555, 561 (1939); see also State v. Carleton College, 154 Minn. 280, 287 (Minn. 1923) ("The fact remains that all [of the property] is in use, and, except as to incidental matters, wholly devoted

to present legitimate purposes of the [educational] institution."). Supreme Court decisions reflected this consensus. See Better Business Bureau of Wash., D.C. v. United States, 326 U.S. 279, 283 (1945) (the word exclusively "plainly means that the presence of a single non-educational purpose, *if substantial in nature*, will destroy the exemption regardless of the number or importance of truly educational purposes") (emphasis added); Trinidad v. Sagrada Orden de Predicadores, 263 U.S. 578, 582 (1924) (in using properties held for exempt purposes to produce income, the corporation "is adhering to and advancing these purposes, and not stepping aside from them or engaging in a business pursuit").

It is significant that these early decisions were not based on the Treasury Department's interpretation of the term "organized and operated exclusively for religious, charitable, or educational purposes." The Commissioner won some cases on the facts and lost others. Treasury Regulations were rarely cited. The earliest regulation cited by the government on appeal reflected this established judicial consensus, not an aggressive agency interpretation of the word "exclusively":

> An educational organization within the meaning of the Act is one designed primarily for the improvement or development of the capabilities of the individual, but, under exceptional circumstances, may include an association whose sole purpose is the instruction of the public, or an association whose primary purpose is to give lectures on subjects useful to the individual and beneficial to the community, even though an association of either class has incidental amusement features.

> \*    \*    \*    \*    \*

> A corporation otherwise exempt under section 101 (6) does not lose its status as an exempt corporation by receiving income such as rent, dividends, and interest from investments, provided such income is devoted exclusively to one or more of the purposes specified in that section.

-9-

Regulations 86 (1935 ed.), Art. 101(6)-1; see Treas. Reg. § 3.101 (6)-1 (1938); Treas. Reg. § 29.101(6)-1 (1943 cum. supp.).[5] The relevant point, we conclude, is that the "principal purpose" and "incidental" activities principles were not the product of judicial deference to agency interpretation. They were judicial interpretations of the charitable tax exemption and deduction statutes to which the agency deferred. As the Third Circuit summarized this landscape some years later:

> Judicial interpretation has put a gloss on the provisions of the statute and it has been held in substance, despite the express provisions of [1939 Code] Section 101(6) to the contrary, that where the predominant purpose for which a foundation is organized is 'in its broadest sense' religious, charitable or education, the foundation is entitled to income-tax exemption under the section cited even though some of its funds are to be used for non-charitable purposes.

Francis Edward McGillick Found. v. Commissioner, 278 F.2d 643, 646 (3d Cir. 1960); cf. Tidwell v. Anderson, 72 F.2d 684 (2d Cir. 1934).

(2) By 1943, Congress was concerned that judicial weakening of the "exclusivity" requirement created a tax loophole in which for-profit businesses "which are not exempt from income taxes . . . are escaping their fair share of the tax burden," 89 Cong. Rec. 9913 (1943) (remarks of Congressman Doughton). In the Revenue Act of 1943, Congress amended the 1939 Code to require exempt organizations to file annual returns, maintain such records, and comply with such

---

[5]"Organization" as used in this Treasury Regulation was obviously a shorthand reference to the statutory term "corporations, and any community chest, fund, or foundation" in what became § 101(6) of the 1939 Code. "Educational organization" isolates taxpayers exempt because they are "organized and operated exclusively" for educational purposes as opposed to other charitable purposes.

rules and regulations as the Commissioner may prescribe.[6]  In the Revenue Act of 1950, Congress addressed a variety of substantive abuses by denying a tax exemption under § 101(6) of the 1939 Code to an organization that engaged in specified prohibited transactions, and denied a deduction for a charitable contribution to that organization.  However, in a list of organizations excepted from these provisions, Congress included, as in the 1943 return-filing statute:

> (2) an educational organization exempt under section 101(6), if such organization normally maintains a regular faculty and curriculum and normally has a regularly organized body of pupils or students in attendance at the place where its educational activities are regularly carried on . . . .[7]

The statute also added to the list of excepted organizations "(5) an organization the principal purposes or functions of which are the providing of medical or hospital care or medical education or medical research."  Revenue Act of 1950, Pub. L. No. 81-814, § 331, 64 Stat. 906, 957 (1950).  The Senate Finance Committee Report explained: "The organizations excluded from the application of these provisions are in general what might be called 'public' organizations and because of this characteristic are not believed likely to become involved in any of these prohibited transactions."  S. Rep. No. 81-2375, at 38 (1950).

Section 301 of the Revenue Act of 1950 also enacted the UBIT now found in IRC §§ 511-514.  64 Stat. at 947-53.  Educational organizations and most other tax exempt organizations were not exempt from the UBIT.  But the initial definition of

---

[6]See Revenue Act of 1943, Pub. L. No. 78-235, § 117(a), 58 Stat. 21, 37 (1944), now found in IRC § 6033(a)(3)(C)(ii) with a cross reference to § 170(b)(1)(A)(ii).

[7]S. Rep. No. 78-627, at 46 (1943) explained that the word "normally" was added to the regulation "due to war conditions."

and exclusions from the UBIT failed to close loopholes such as sale and lease-back transactions between tax exempt charities and for-profit businesses. To discourage these transactions, the Commissioner issued a revenue ruling stating that such transactions were subject to the ordinary income tax because they were not sales for purposes of the capital gains tax, and aggressively litigated the issue. But the Supreme Court held that the Commissioner construed the word "sale" in a manner that "is contrary to the policy of the capital gains provisions of the Internal Revenue Code, and has no support in the cases." Clay Brown, 380 U.S. at 570. In ruling for the taxpayer, the Court concluded that Congress considered the problems involved in such transactions and

> responded, if at all, with precise provisions of narrow application. We consequently deem it wise to leave to the Congress the fashioning of a rule which, in any event, must have wide ramifications.

Id. at 579 (quotation omitted). See generally Clarence LaBelle Post No. 217, Veterans of Foreign Wars of U.S. v. United States, 580 F.2d 270, 272-74 (8th Cir. 1978) (describing the "macaroni monopoly" loophole).

(3) In the Internal Revenue Code of 1954, Congress moved the deduction for charitable contributions from § 23(o) of the 1939 Code to IRC § 170(c) and provided in § 170(b)(1)(A) for an increased deduction for contributions made to three types of exempt § 501(c)(3) organizations: "(i) a church, a convention or association of churches, or a religious order; (ii) an educational organization referred to in section 503(b)(2) of the bill; and (iii) a hospital referred to in section 503(b)(5)," but not "medical education and research organizations referred to in section 503(b)(5)." S. Rep. No. 83-1622, at 208 (1954), describing the Revenue Act of 1954, Pub. L. No. 83-591, § 170, 68A Stat. 1, 58-60. Section 503(b)(2) limited this new tax advantage to the subset of exempt "educational organizations" that were excepted from the prohibited transaction rules in the Revenue Act of 1950. Congress eventually moved

-12-

this limiting language from IRC § 503(b)(2) to § 170(b)(1)(A)(ii), where it remains today. Tax Reform Act of 1969, Pub. L. No. 91-172, § 201, 83 Stat. 487, 528-29.

In 1958, the Treasury Department promulgated a regulation stating that "[a]n educational organization within the meaning of section 170(b)(1)(A)(ii) is one whose primary function is the presentation of formal instruction and which normally maintains . . . ," a provision substantively identical to the language at issue today. Charitable, Etc., Contributions and Gifts, 23 Fed. Reg. 1759, 1761 (Mar. 14, 1958) (codified as Treas. Reg. § 1.170-2(b)(3)). In Brundage v. C.I.R., 54 T.C. 1468, 1473-74 (1970), the Tax Court concluded that "the congressional committee reports of 1950 and 1954 are not inconsistent with the [Commissioner's] regulation but offer no active support of it." Rejecting the Commissioner's position, the Tax Court held that a museum operated by the City of San Francisco and open to the general public, while not "used *primarily* for formal instruction," was "in operation an integral part of and valuable adjunct to the San Francisco school system" and therefore a gift to the City for use in the museum was entitled to the greater deduction under § 170(b)(1)(A)(ii). Id. at 1474-75 (emphasis in original). The Commissioner acquiesced in the result, see 1970 WL 22991.

In the Tax Reform Act of 1969, Congress expanded the UBIT by adding to prior business lease indebtedness provisions of IRC § 514 new provisions that included in unrelated business taxable income an amount determined by the "acquisition indebtedness" of "debt financed property," defined as "*any property which is held to produce income and with respect to which there is an acquisition indebtedness.*" IRC §§ 514(a)(1), (b)(1); see Pub. L. No. 91-172, § 121(d), 83 Stat. 487, 543-48 (emphasis added). For debt financed property, these provisions trump UBIT exclusions for dividends and interest and certain rents and capital gains that would otherwise apply. See IRC § 512(b); Bartels Trust for Ben. of Univ. of New Haven v. United States, 209 F.3d 147, 149 & n.1 (2d Cir.), cert. denied, 531 U.S. 978 (2000).

(4) Applying these UBIT provisions, the Third Circuit held in <u>Elliott Knitwear Profit Sharing Plan v. Commissioner</u>, 614 F.2d 347, 349-51 (3d Cir. 1980), that UBIT applied to income from debt-financed investments earned by an employee profit sharing plan that was tax exempt under IRC § 401, because incurring the indebtedness was not "inherent in the performance or exercise of the [organization's exempt] purpose or function" within the meaning of § 514(c)(4). Congress quickly responded to the impact of this UBIT expansion on debt financed revenues that fund benefits paid by tax exempt employee pension plans. In § 110(a) of the Miscellaneous Revenue Act of 1980, Congress amended IRC § 514(c) to provide in new subparagraph (9) that "'acquisition indebtedness' does not include indebtedness incurred by a qualified trust [under section 401] in acquiring or improving any real property." Pub. L. No. 96-605, 94 Stat. 3521, 3525-26.

The final chapter in the evolution of the IRC provisions here at issue came in § 1034(a) of the Deficit Reduction Act of 1984 when Congress, over the Treasury Department's opposition, expanded this UBIT exclusion to indebtedness incurred by "an organization described in section 170(b)(1)(a)(ii)" and its affiliated support organizations. Pub. L. No. 98-369, 98 Stat. 494, 1039. In hearings considering the bills, statements by officials from Yale University, the University of Iowa, and the Bishop Estate's Kamehameha Schools in Hawaii argued that private colleges and schools have the same need as pension plans to diversify their investments and maximize investment income, but are unable to buy significant real estate without borrowing money. <u>See</u> *Hearing on S. 927, S.1183, and H.R. 2163 Before the Subcomm. on Tax'n & Debt Mngmt of the S. Comm. on Finance*, 98th Cong. 186-254 (1983). Treasury opposed the bills, complaining that, like the trust exemption, this provision would permit use of an educational institution's tax exemption for the benefit of taxable persons, and opposing "piecemeal exceptions such as the one proposed in this bill for real estate investments by schools." <u>Id.</u> at 86-90. To alleviate one Treasury concern, the bill as enacted provided that, for real property

-14-

held by a partnership, all the partners must be qualified organizations.  See § 514(c)(9)(B)(vi)(I); H.R.  No. 98-861, at 1096-98 (1984) (Conf. Rep.).

## B. Conclusions We Draw from This History.

(1)  We agree with the district court that Treasury Regulation § 1.170A-9(c)(i) adds unreasonable conditions to the statutory requirement that a qualified educational organization is one "which normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on."  The requirement that the organization's "primary function [must be] the presentation of formal instruction" has no long history of congressional acceptance.  First promulgated in 1958, it was a dramatic departure from the description of an educational organization's primary purpose in the regulation relating to § 101(6) of the 1939 Code, which was a summary of judicial decisions construing the charitable exemption statute.  The Tax Court in Brundage commented that recent legislative history "offer[ed] no active support" of this restrictive language in rejecting the Commissioner's position and concluding that gifts to a museum operated by the City of San Francisco qualified for the increased charitable deduction in § 170(b)(1)(A).  Applying this language to a more recent statute enacted to provide limited relief from the UBIT has the earmarks of an agency interpretation intended to nullify a statutory benefit the Treasury Department unsuccessfully opposed.  As in United States v. Home Concrete & Supply, LLC, "Congress . . . decided the question definitively, leaving no room for the agency to reach a *contrary* result."  566 U.S. 478, 489 (2012) (plurality) (emphasis added).

(2)  Though the regulation unreasonably limits "educational organizations" to those principally providing "formal instruction," the terms "primary function" and "merely incidental" activities have a valid role in interpreting the statute.  Section 170(b)(1)(A) allows qualifying individuals an increased limit on deductible

-15-

"charitable contributions." The term "charitable contribution" is defined to include gifts to a "corporation, trust, or community chest, fund, or foundation . . . organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes," § 170(c)(2)(B), the definition of organizations that are tax exempt under § 501(c)(3). Section 170(b)(1)(A) uses the term "educational organization" to identify a specific type of entity in the "charitable contribution" definition, and it then adds additional requirements that must be met for the qualifying individual to apply the deduction. Therefore, an "educational organization" as used in § 170(b)(1)(A)(ii) must be "organized and operated exclusively for . . . educational purposes."

The settled *judicial* interpretation of "organized and operated exclusively," established and consistently followed for nearly a century, includes organizations whose "primary purpose" was one or more qualifying charitable uses, and whose non-charitable activities were "merely incidental" to those purposes. Congress has retained this "organized and operated exclusively" requirement for more than a century, obviously aware of the judicial non-literal construction of the word "exclusively." Thus, it is reasonable -- in our view necessary -- that "educational organization" in § 170(b)(1)(A)(ii) be construed as one that is "organized and operated exclusively for" one or more qualifying charitable uses. And because Congress limited the charitable tax advantage in § 170(b)(1)(A)(ii) to only one of the charitable uses enumerated in § 501(c)(3), it is valid to interpret the statute as requiring that a qualifying organization's primary purpose be "educational" and that its *noneducational* activities be merely incidental to that primary purpose. See Chapman v. Commissioner, 48 T.C. 358, 365 (1967); cf. Estate of Johnson v. Commissioner, 56 T.C. 944, 947-48 (1971) (Iowa State University satisfies the requirements of § 170(b)(1)(A)(ii)).

(3) That "primary" purpose or function and "merely incidental" have an important role to play in interpreting the term "educational organization" in § 170(b)(1)(A)(ii) does not establish the validity of the restrictive requirement that

the "primary function" be "the presentation of formal instruction." A century of judicial decisions, and the Treasury Regulations summarizing those decisions prior to 1958, establish that a tax exempt "educational purpose" includes, for example, non-profit educational magazines, De Forest, 19 B.T.A. at 600, and a museum dedicated to educating the public, Brundage, 54 T.C. at 1474-75. The above-quoted Treasury Regulation defining educational organization for purposes of § 101(6) of the 1939 Code that was quoted and deemed "highly relevant" in Better Business Bureau, 326 U.S. at 286 & n.7, reflected this broader definition of educational purpose and is the relevant source for defining the primary purpose and function of an "educational organization" under § 170(b)(1)(A)(ii). The current regulations interpreting the term "organized and operated exclusively" in IRC § 501(c)(3) include "educational" in the list of qualifying charitable purposes and carry forward this broad view of a tax-exempt educational purpose. See Treas. Reg. §§ 1.501(c)(3)-1(a) and (d)(3)(i)-(ii). That is the proper frame of reference.

(4) Mayo argues that, rather than the regulation, the statutory criteria of faculty, curriculum, students, and place unambiguously define the term "educational organization" as used in § 170(b)(1)(A)(ii). Like the district court, we disagree. Mayo asserts that use of the word "which" is definitional in nature and cites legislative history suggesting Congress viewed the statutory criteria as definitional. See S. Rep. No. 86-878, at 8 (1959) (stating there were questions regarding whether "the reference to 'educational organizations' in this definition" included parochial schools). Although "which" may precede a definition in some statutes, here it does no more than introduce a clause limiting a broader universe -- organizations that are tax exempt under IRC § 501(c)(3) because they are "organized and operated exclusively for . . . educational purposes."

This is made clear by examining related IRC provisions. In enacting the 1954 Code, Congress added a charitable deduction for each dependent who is a student, defined as "an individual who . . . is a full-time student at an educational institution;

or is pursuing a full-time course of institutional on-farm training . . . ." IRC § 151(e)(1) (1954). For this deduction, the statute provides that "'educational institution' *means only* an educational institution which normally maintains a regular faculty and curriculum and normally has a regularly organized body of students in attendance at the place where its educational activities are carried on." IRC § 151(e)(4) (emphasis added). In § 151(e)(4), Congress used the word "means." In § 170(b)(1)(A)(ii), it used the word "which." When referencing IRC § 151 in other sections, Congress used the word "defined," whereas numerous references to IRC § 170(b)(1)(A)(ii) used the term "describe" rather than "define." See, e.g., IRC §§ 21(e)(8), 117(a), 152(f)(2), 415(n)(3)(C)(ii), 508(c)(2)(A). When enacting definitions, Congress used words such as "means," rather than "which," over thirty times in IRC § 170. See Mayo, 412 F. Supp. 3d at 1053.

## C. Application to Mayo.

Having determined that IRC § 170(b)(1)(A)(ii) is unambiguous in its requirement that the taxpayer be an educational organization, i.e. a tax-exempt organization under 501(c)(3) whose primary activity is education, we now turn to its application to Mayo. Summary judgment is reviewed *de novo* and is only proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. See Armstrong v. United States, 366 F.3d 622, 625 (8th Cir. 2004). Whether the taxpayer is an educational organization is a mixed question of law and fact. Neither party directly addresses application on appeal.

The analysis normally unravels in three parts: (1) whether the taxpayer is "organized and operated exclusively" for one or more exempt purposes; (2) whether the taxpayer is "organized and operated exclusively" for educational purposes; and (3) whether the taxpayer meets the statutory criteria of faculty, curriculum, students,

and place.[8] Failure to satisfy any part renders the taxpayer ineligible for the UBIT exemption provided to § 170(b)(1)(A)(ii) organizations. The government concedes that Mayo satisfies the first criteria. Further, by virtue of the Mayo College, the government also concedes the third criteria.

In short, it must be determined whether Mayo's overall purpose and operations establish that it is "organized and operated exclusively" for educational rather than other purposes. That some of its educational purposes and functions also fall within other charitable categories -- and vice versa -- would not disqualify it from being an educational organization, but "the presence of a single non-educational purpose, if substantial in nature, will destroy the [UBIT] exemption regardless of the number or importance of truly educational purposes." Better Bus. Bureau, 326 U.S. at 283. The balance is educational against noneducational.

Applying the statute to Mayo is not possible on this record. First, how to measure educational activity as opposed to noneducational activity, as well as the degree to which education must be Mayo's primary purpose, are disputed. The government relies on expenses and revenue disclosed on Mayo's Forms 990, while Mayo emphasizes a totality of the circumstances approach. Additionally, the government believes that education including the operation of medical schools must be the § 501(c)(3) taxpayer's principal or most important purpose while Mayo contends it need only be substantial. Compare Malat v. Riddell, 383 U.S. 569, 572 (1966) (per curiam) (holding primarily means "of first importance"), with Bd. of

---

[8]To state the obvious, given the faculty, curriculum, students, and place requirements in § 170(b)(1)(A)(ii), "merely carrying on charitable or educational purposes within the meaning of Section 501(c)(3)" is not enough. Miller v. United States, 393 F. Supp. 831 (E.D. Mo.), aff'd per curiam, 527 F.2d 231 (8th Cir. 1975). The taxpayer must still meet these "essential elements required by [Section 170(b)(1)(A)(ii)]." Id. This is true even if its primary function need not be "presentation of formal instruction."

-19-

Governors of Fed. Res. Sys. v. Agnew, 329 U.S. 441 (1947) (holding "primarily" to mean "substantial"). Second, Mayo's status as an academic medical center means that its medical and educational purposes -- and the operations supporting those functions -- are inextricably intertwined. Separating out the wheat from the chaff -- the educational from the noneducational -- while difficult, is not impossible. Cf. Mayo Found., 282 F. Supp. 2d at 1000-05, 1013-15. For the reasons we have explained, the district court did not reach these questions and the summary judgment record is not adequate to permit us to decide it as a matter of law. In these circumstances, we leave these difficult and fact-intensive issues of fact and law to the district court on remand. Cf. Gundersen Med. Found., Ltd. v. United States, 536 F. Supp. 556 (W.D. Wisc. 1982).

## II. Conclusion

For the foregoing reasons, we reverse the district court's invalidation of Treasury Regulation § 1.170A-9 to the extent it is not inconsistent with IRC § 170(b)(1)(A)(ii) and remand for proceedings consistent with this opinion.

GRUENDER, Circuit Judge, concurring in part and concurring in the judgment.

The court concludes that "educational organization" in 26 U.S.C. § 170(b)(1)(A)(ii) unambiguously means an organization whose primary function is broadly educational and whose noneducational activities are merely incidental to that primary function. *See supra* at 15-18. I agree with this conclusion. The court comes to it by relying largely on the statutory and interpretive history of the phrase. *See supra* at 6-15. I agree with this reasoning. *See, e.g.*, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001) (finding that a provision of the Clean Air Act was unambiguous by interpreting the text "in its statutory and historical context"); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (noting that when "judicial interpretations have settled the meaning of an existing statutory

provision, repetition of the same language in a new statute" generally indicates "the intent to incorporate its . . . judicial interpretations as well").

But I disagree with the court's decision to resort to legislative history in several places. *See supra* at 10-11, 11 n.7, 12, 14-15. In my view, none of it is necessary to determine what the phrase "educational organization" means. The court's own analysis shows as much. Apart from one passing reference, *see supra* at 15, the court's decision turns on the statutory and interpretive history of "educational organization," *see supra* at 15-18. Because these other considerations decide the matter, I would not resort to legislative history, even in the limited ways the court does. *See United States v. Geiser*, 527 F.3d 288, 294 (3d Cir. 2008) ("[L]egislative history should not be considered at *Chevron* step one."); *Nat'l Elec. Mfrs. Ass'n v. U.S. Dep't of Energy*, 654 F.3d 496, 505 (4th Cir. 2011) ("[I]n consulting legislative history at step one of *Chevron*, we have utilized such history only for limited purposes, and only after exhausting more reliable tools of construction."); *cf. United States v. Mast*, 938 F.3d 973, 979-80 (8th Cir. 2019) (Colloton, J., dissenting) (reciting various "problems with relying on legislative history"). Thus, I do not join those parts of the opinion referring to legislative history.

Accordingly, I concur in part and concur in the judgment.

_____

-21-