# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-2246

_____

Mayo Clinic, a Minnesota Corporation, on its own behalf
and as successor in interest to Mayo Foundation

*Plaintiff - Appellee*

v.

United States of America

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: October 23, 2024
Filed: July 25, 2025

_____

Before LOKEN, SMITH, and GRASZ, Circuit Judges.

_____

LOKEN, Circuit Judge.

Mayo Clinic ("Mayo") is a Minnesota nonprofit corporation and a tax-exempt organization under Section 501(c)(3) of the Internal Revenue Code ("IRC"), 26 U.S.C. § 501(c)(3). In this complex tax case, Mayo seeks the refund of substantial unrelated business income tax ("UBIT") imposed by the Internal Revenue Service ("IRS") and paid by Mayo based on the acquisition indebtedness of property held by

Mayo to produce income in tax years 2003, 2005-2007, and 2010-2012 (the "Tax Years"). See IRC § 514(c)(9). On remand from our court, the district court,[1] after a week-long bench trial, granted Mayo summary judgment, concluding that Mayo is an "educational organization" that is exempt from acquisition indebtedness UBIT under IRC § 170(b)(1)(A)(ii). The United States appeals. We affirm.

## I. Framing the Tax Issues.

Section 501(c)(3) exempts from taxation corporations and foundations "organized and operated exclusively for religious, charitable, scientific . . . or educational purposes." The IRC also allows individual taxpayers to deduct "charitable contribution[s]" to "an educational organization which normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on." IRC § 170(b)(1)(A)(ii).

More than fifty years ago, concerned that judicial weakening of the § 501(c)(3) exclusivity requirement had created a tax loophole for for-profit businesses, Congress imposed the UBIT on 501(c)(3) organizations. See IRC §§ 512-14. In the Tax Reform Act of 1969, Congress expanded the UBIT to include an amount determined by the acquisition indebtedness of debt-financed property that is held to produce income. Id. § 514(a)(1), (b)(1). However, the UBIT provision at issue provides that acquisition indebtedness does not include debt incurred by a "qualified organization" in acquiring or improving real property. Id. § 514(c)(9)(A), (C)(i). Qualified organizations include 501(c)(3) educational organizations as defined in § 170(b)(1)(A)(ii).

---

[1]The Honorable Eric C. Tostrud, United States District Judge for the District of Minnesota.

After a 2009 audit and subsequent Notice of Proposed Adjustment, the IRS assessed Mayo $11,501,621 in unpaid acquisition indebtedness UBIT. The IRS concluded that Mayo's acquisition indebtedness was not exempt from UBIT because Mayo in the Tax Years was not a § 170(b)(1)(A)(ii) qualified organization as defined in Treasury Regulation (26 C.F.R.) § 1.170A-9(c)(1) -- its "primary function" was not "the presentation of formal instruction," and its noneducational activities were not "merely incidental to [its] educational activities." Mayo paid the amount assessed and brought this refund action in September 2016.

The district court granted Mayo summary judgment, concluding it is an educational organization as defined in § 170(b)(1)(A)(ii). The court held Treasury Regulation § 1.170A-9(c)(1) invalid because it added the "primary function" and "merely incidental" requirements to § 170(b)(1)(A)(ii). Mayo Clinic v. United States, 412 F. Supp. 3d 1038, 1042, 1057 (D. Minn. 2019). The United States appealed. We reversed the district court's invalidation of Treasury Regulation § 1.170A-9(c)(1) "to the extent it is not inconsistent with IRC § 170(b)(1)(A)(ii)" and remanded for further proceedings consistent with our opinion. Mayo Clinic v. United States, 997 F.3d 789, 802 (8th Cir. 2021) (Mayo I).

Our lengthy opinion carefully reviewed more than one hundred years of relevant statutory, regulatory, and judicial developments. We concluded that, given the settled judicial interpretation of "organized and operated exclusively" in IRC § 501(c)(3), "it is valid to interpret [§ 170(b)(1)(A)(ii)] as requiring that a qualifying organization's primary purpose be 'educational' and that its *noneducational* activities be merely incidental to that primary purpose." Mayo I, 997 F.3d at 800. However, we agreed with the district court that "Treasury Regulation § 1.170A-9(c)(1) add[ed] unreasonable conditions" to the statutory requirements for a qualified educational organization -- "[t]he [1958] requirement that the organization's 'primary function [must be] the presentation of formal instruction' has no long history of congressional acceptance." Id. at 799. Because we could not determine from the record on appeal

"whether Mayo's overall purpose and operations establish that it is 'organized and operated exclusively' for educational rather than other purposes," we remanded to the district court for further proceedings, noting that "Mayo's status as an academic medical center means that its medical and educational purposes -- and the operations supporting those functions -- are inextricably intertwined." Id. at 802. We held that "the presence of a single non-educational purpose, if substantial in nature, will destroy the UBIT exemption regardless of the number or importance of truly educational purposes." Id. (cleaned up), quoting Better Bus. Bureau of Wash., D.C. v. United States, 326 U.S. 279, 283 (1945). We noted that this may make "[s]eparating out the wheat from the chaff -- the educational from the noneducational . . . difficult [but] not impossible." Id.

On remand, following a week-long bench trial, the district court concluded that "primary" in this context means "substantial." It found that Mayo had a substantial educational purpose and no substantial noneducational purpose during the Tax Years because its educational functions are "inextricably intertwined" with its clinical and research functions. The court determined that Mayo uniquely integrates education, clinical practice, and research across all of its operations such that "education is a substantial part of Mayo's reason to exist" that dates back to Mayo's founding. The court granted Mayo judgment for the full amount of its refund claim, plus statutory interest. The government appeals the court's conclusion that Mayo lacks a substantial, noneducational purpose and its interpretation of "primary" to mean "substantial" in this context.

## II. Background

Mayo traces its history to 1863, when Dr. William Worrall Mayo, an English-born physician who completed his medical training in Indiana, arrived in Rochester, Minnesota to serve as examining surgeon at an enrollment board for Union Army recruits. He settled in Rochester permanently with his family and established a

medical practice.  His two sons, Drs. William J. Mayo and Charles H. Mayo joined the practice in the 1880s after completing their medical training.

A tornado swept through Rochester in 1883, resulting in more than twenty deaths and dozens more injuries.  Mother Alfred Moes of the Sisters of Saint Francis congregation in Rochester set out to build a hospital that would be open to all and asked Dr. William Worrall Mayo to lead its medical staff.  Saint Marys Hospital officially opened in 1889.  The day before it opened, the Mayo brothers completed the first surgery at the facility.  Saint Francis nuns formed the hospital's nursing staff.

By the early 1890s, the brothers had taken charge of the family practice, quickly gaining a national reputation for their innovative and collaborative approach to treatment.  Their practice came to be known as the Mayo Clinic.  As it grew, the brothers committed to developing and funding medical education and training programs.  They began hosting doctors from around the country to observe surgeries and shared their knowledge of the latest medical techniques.  In 1905, the brothers began offering fellowships to visiting physicians, training their first fifty fellows over the next decade.  In 1906, they established the Surgeons Club, the precursor of Mayo's School of Continuous Professional Development, which offers continuing education for medical professionals from around the world.

In February 1915, the brothers endowed the Mayo Foundation for Medical Education and Research with $2 million of their personal wealth.  The Foundation operated the Mayo School of Graduate Medical Education to train residents and fellows. In 1917, they transferred its endowment to the management of the University of Minnesota, which granted degrees for Mayo graduates until its programs were later independently accredited, with the condition that the funds could only be used to support medical education in Rochester.  Two years later, the Colonial Hospital Training School for Nurses opened in downtown Rochester.

Before 1919, the Mayo brothers personally owned the assets of their private practice. That year, they transferred all practice assets and the majority of their personal savings to a nonprofit entity called the Mayo Properties Association (a gift worth approximately $10 million at the time). The 1919 Deed of Gift stated that the purpose of the gift was:

> To aid and advance the study and investigation of human ailments and injuries, and the causes, prevention, relief and cure thereof, and the study and investigation of problems of hygiene, health and public welfare, and the promotion of medical, surgical and scientific learning, skill, education and investigation, to engage in and conduct and to aid and assist in medical surgical and scientific research in the broadest sense.

All proceeds beyond operating expenses would be put towards education, research, and patient care. The Deed of Gift included two conditions. First, if the Association determined it could no longer fulfill the purposes laid out in the Deed of Gift, it could transfer the gift "to a Medical School or to a University or College maintaining one." Second, the gift would revert to the brothers if its purposes were not fulfilled.

At the time of the transfer, Mayo physicians, scientists, and other personnel were employed by the Associates of the Mayo Clinic, a nonprofit-partnership entity. No employee had a stake in the Associates or the Mayo Clinic's profits. Employees received fixed salaries. The Associates' net income was transferred to the Mayo Properties Association as compensation for the Associates' use of real estate and equipment owned by the Association, which in turn used its income and assets to fund education and research. In 1965, the IRS designated the Associates of the Mayo Clinic as a tax-exempt organization under § 501(c)(3).

The brothers' groundbreaking contributions to modern medicine and medical education garnered national attention. In recognition of the Mayo brothers' service

to their country, including providing free medical care to World War I veterans, President Franklin D. Roosevelt came to Rochester in 1934 and presented the Mayo brothers an American Legion award, referring to the brothers as "teachers of America." In 1969, the Mayo Properties Association, renamed the Mayo Foundation, merged with the Associates of the Mayo Clinic. The IRS determined that the merger did not affect the Foundation's 501(c)(3) status because the Associates "contribute[d] importantly to" the Foundation's "educational and scientific research purposes and is commensurate in size with those activities." By 1969, Mayo employed more than 400 physicians, surgeons, and scientists and treated approximately 200,000 patients annually. Eighty percent of the physicians held academic rank; 1,500 to 1,800 physicians visited Mayo each year to observe its medical activities.

Having trained physicians and health professionals since the late 1800s, Mayo began to formalize more of its educational offerings in the early 1970s. In 1972, it established the Mayo Clinic School of Medicine, a fully-accredited medical school offering a traditional four-year M.D. curriculum. It established the Mayo School of Health Sciences in 1973 to train allied health professionals. The School of Medicine and the School of Health Sciences are two of the five schools Mayo operated during the Tax Years. The Mayo Clinic School of Graduate Medical Education, offering residency and fellowship training, dates back to 1915, one of the world's first formal graduate training programs for physicians. During the Tax Years, it offered the most accredited residency and fellowship programs in the country. The Mayo Clinic School of Continuous Professional Development, with origins in the Mayo brothers' Surgeons Club, was formally established in 1997. It offers courses in continuing medical education for physicians and allied health professionals. The Mayo Clinic Graduate School of Biomedical Sciences, which offers M.S. and PhD degrees in biomedical sciences, conferred its first PhD degree in the early 1900s in partnership with the University of Minnesota. It was formally established in 1989.

At trial, four witnesses testified about Mayo's history, operations, and finances: (1) Jonathan Oviatt, Mayo's Chief Legal Officer and Corporate Secretary from 2002 to 2015; (2) Dr. Mark A. Warner, Dean of the Mayo School of Graduate Medical Education from 2005 to 2012 and Executive Dean of Education from 2012 to 2016; (3) Dr. John Noseworthy, Mayo's Chief Executive Officer from 2009 to 2018; and (4) Melvin "Chip" Hurley, an expert witness who opined on the integration of its educational and clinical operations and its primary educational function. The district court analyzed Mayo's system-wide operations and concluded that Mayo's substantial purpose is educational, and even though its patient care functions are substantial, they are not noneducational. The court highlighted certain features of Mayo's structure and operations in its lengthy post-trial findings of fact and conclusions of law.

First, the court found, Mayo's organization and governance reflect the principal role of education. The 1919 Deed of Gift places "the promotion of medical, surgical and scientific learning, skill, education and investigation" at the core of Mayo's purpose, conditioning its continued existence on a commitment to the Mayo family's philosophy of serving the general good of humanity. Mayo's corporate governance documents and modern mission statement during the Tax Years emphasized its educational purpose. Mayo's Articles of Incorporation stated that it "is organized and shall be operated exclusively for charitable, educational, and scientific purposes." The preamble to Mayo's bylaws states that, after compensating staff, "the rest of the [Clinic] earnings should be used for the benefit of the public . . . through better care of the sick, medical education for better trained doctors, research and the general welfare of the public." Mayo's mission statements during the Tax Years reaffirmed a commitment to "integrated clinical practice, education and research."

Second, the district court found that Mayo's extensive educational offerings and day-to-day operations reflect its substantial educational purpose. Each of Mayo's five schools offers high-quality medical education, reflected in their stellar accreditation records. Mayo also had the highest first-time board certification rate in

the country for a number of resident and fellowship specialty programs. Day-to-day, Dr. Warner testified that students are taught in the classroom and also "anywhere that there's patient care," from the operating room to the hallways. Mayo physicians are expected to participate in education and obtain academic rank. The court found that Mayo's facilities are predominantly used for educational purposes, and "the medical treatment and research at Mayo nearly always serves an educational purpose -- even when involving students renders health care more expensive."

Mayo has invested substantially in the growth of its schools. As enrollment increased, Mayo ensured that it maintains a high volume of patients and a large population of patients with complex diseases. For example, Dr. Warner testified that each year Mayo flies in up to fifty patients with congenital heart disease from Mongolia, at an annual cost of $5 million, to ensure that cardiovascular surgery fellows can meet their treatment requirements for board certification. In addition, Mayo spends $2 million annually in partnership with the University of Minnesota to offer genetic counseling internships. Mayo is recognized as one of the best academic medical centers globally. The School of Medicine consistently ranks in the top twenty programs in the United States.

Third, the district court found that Mayo's finances reflect its substantial educational purpose. During each Tax Year, its educational and research activities operated at a significant net financial loss. As net income from its clinical practice did not cover these losses, Mayo spent more on education and research than it made from patient care. Mayo also spent, by one estimate, 35.6% of the fair market value of its endowment on education during the Tax Years.

Based on the trial record, the district court concluded that Mayo has a substantial educational purpose. In Mayo I, we held that, for an organization to qualify as educational under § 170(b)(1)(A)(ii), it cannot have any substantial, noneducational purposes. 997 F.3d at 802. Turning to that question, the district court

reasoned that even if one of Mayo's activities furthered both educational and noneducational purposes, it could still be considered "exclusively" educational: "The relevant inquiry is not whether a particular activity has some purpose *in addition* to education, but whether a particular function has *no* educational purpose *and* is a substantial part of Mayo's organizational purpose." After weighing the trial evidence, the district court concluded that Mayo has no substantial, noneducational purposes because it uniquely integrates education, research, and clinical practice across all of its operations. Mayo's educational functions are "inextricably intertwined with its other functions." The trial evidence "did not identify a 'substantial' clinical practice function at Mayo that did not further the goal of providing training and education to the students at its colleges." Though Mayo's governing documents reference noneducational activities including patient care and medical practice, and statements by Mayo representatives have emphasized the importance of patient care, the court concluded that "[w]hile patient care is certainly substantial, it is not noneducational at Mayo" because of its careful integration of education and clinical practice.

The government argued that Mayo does much more than provide medical education. Its "three-part mission" -- clinical practice, education, and research -- is reflected on its logo featuring three interlocking shields. In 1986 and 1987, Mayo expanded to Jacksonville, Florida, and Scottsdale, Arizona, respectively. In the early 1990s, it began acquiring clinics and hospitals within a two-hundred-mile radius of Rochester to form what is now referred to as the Mayo Clinic Health System ("MCHS"). In Tax Year 2007, Mayo reported $2 billion in patient care expenses.

The district court concluded that Mayo's ownership of the MCHS network and clinics in Florida and Arizona did not demonstrate a substantial, noneducational purpose because trial evidence and testimony demonstrated that MCHS was started to improve Mayo's educational offerings. Education occurs at almost every MCHS site. Broadening Mayo's catchment area beyond Rochester improves its educational

offerings by drawing patients with less common conditions and diseases. And at least 97% of Mayo's physicians at locations in Rochester, Florida, and Arizona have academic rank. Though it is possible that patients could receive care with little or no student contact, the "overwhelming majority of evidence show[s] that Mayo integrates its education, patient care, and research functions." In addition, the court found that research, the third core mission, was "integral" to its graduate programs. More than half of Mayo Medical School students publish a paper in a peer-reviewed publication by the time they graduate. This research mission operated at a significant net financial loss during each of the Tax Years.

In an interview for the Yale School of Management, Mayo's museum director summarized how Mayo differs from traditional academic medical centers:

> Principally, the key innovation of Mayo Clinic goes back to our earliest days, and that's the integrated group practice of medicine. So you have here a collection of physicians, scientists, allied health professionals who unite all their different skills around one mission: serving patients. And that's supported by education and research. Unlike a typical university academic setting, research and education here support the patient-care mission. That really is our major contribution.

This fusion of Mayo's healthcare, education, and research functions was the basis for the district court's conclusion that Mayo has no substantial, noneducational purpose.

### III. Discussion

The government raises two issues on appeal. Both issues were framed in our opinion in Mayo I, 997 F.3d at 802:

> First, how to measure educational activity as opposed to noneducational activity, as well as the degree to which education must be Mayo's primary purpose, are disputed. . . . [T]he government believes that

-11-

education . . . must be the § 501(c)(3) taxpayer's principal or most important purpose while Mayo contends it need only be substantial. . . . Second, Mayo's status as an academic medical center means that its medical and educational purposes -- and the operations supporting those functions -- are inextricably intertwined. Separating out the wheat from the chaff -- the educational from the noneducational -- while difficult, is not impossible.

In a taxpayer refund action, the taxpayer bears the ultimate burden of proving that it qualifies for a claimed tax exemption. Armstrong v. United States, 366 F.3d 622, 625-26 (8th Cir. 2004). We review the district court's legal conclusions and mixed questions of law and fact *de novo*, and its factual findings for clear error. Medtronic, Inc. & Consol. Subsidiaries v. Comm'r, 900 F.3d 610, 613 (8th Cir. 2018).

**A. The Proper Interpretation of "Primary" in "Primary Purpose."** In Mayo I, we traced judicial interpretations of the phrase "organized and operated exclusively" and held that "it is valid to interpret [§ 170(b)(1)(A)(ii)] as requiring that a qualifying organization's primary purpose be 'educational' and that its *noneducational* activities be merely incidental to that primary purpose." 997 F.3d at 800. But we did not decide whether education must be Mayo's "principal or most important purpose" (the government's position) or only a "substantial" purpose (Mayo's position). After the bench trial, the district court ruled that the issue should be determined by analyzing Mayo's system-wide activities and, viewed in that context, "primary" means "substantial." On appeal, the government argues that its interpretation of "primary" to mean more than "substantial" is supported by the relevant statutory and regulatory provisions, case law, and dictionary definitions.

The district court reasoned that its interpretation of "primary" was strongly supported by the Supreme Court's interpretation of that term in Board of Governors of Federal Reserve System v. Agnew, 329 U.S. 441 (1947). In Agnew, the Court considered whether the Federal Reserve Board could order the removal of a bank's

directors because they were also employees of a firm "primarily engaged" in underwriting securities in violation of the Banking Act of 1933. Id. at 443-44. The firm's gross income from underwriting comprised at most 39% of its gross income during the years considered. The Court concluded that the firm was "primarily engaged" in underwriting:

> It is true that 'primary' when applied to a single subject often means first, chief, or principal. But that is not always the case. For other accepted and common meanings of 'primarily' are 'essentially' or 'fundamentally.' An activity or function may be 'primary' in that sense if it is substantial. If the underwriting business of a firm is substantial, the firm is engaged in the underwriting business in a primary way though by any quantitative test underwriting may not be its chief or principal activity.

Id. at 446 (citations omitted). Interpreting primary otherwise, the Court noted, would mean that the firm was not primarily engaged in any line of business, even though it conducted a substantial amount of business in both underwriting and brokerage (which also did not account for more than 50% of its business):

> If 'primarily' is not used in the sense we suggest then the firm is not 'primarily engaged' in any line of business though it specializes in at least two . . . . One might as well say that a professional man is not 'primarily engaged' in his profession though he . . . devotes substantial time to the practice but makes the greater share of his income on the stock market.

The Court also noted that interpreting primary to mean substantial was "more consonant with the legislative purpose" of the Banking Act. Id. at 446-47. Likewise in this case, the district court concluded that the Treasury Regulation giving examples of organizations that are "educational," like the Banking Act in Agnew, is inconsistent with the government's position that education must be the "most

-13-

important" purpose because the regulation includes "[m]useums, zoos, planetariums, symphony orchestras, and other similar organizations" in its examples of "educational organizations." Treas. Reg. § 1.501(c)(3)-1(d)(3)(ii), Example 4. The court observed that "[s]ymphonies, for example, are considered entertainment as much as they are considered educational." Few would dispute that the Minnesota Orchestra primarily engages in the provision of musical entertainment though its performances. Yet such an organization qualifies as educational under the Treasury Regulations.

We agree the reasoning of Agnew applies to this case. Like the underwriting firm in that case, it is difficult to pinpoint a singular, predominant activity for Mayo, an academic medical center whose education, patient care, and research functions are inextricably intertwined. In remanding, we instructed that the Treasury Regulations interpreting the meaning of "organized and operated exclusively," including § 1.501(c)(3)-1(d)(3)(i)-(ii), serve as the "proper frame of reference." Mayo I, 997 F.3d at 800. Those provisions "carry forward [a] broad view of a tax-exempt educational purpose." Id. Mayo's reading of "primary" better aligns with the relevant regulatory provisions and reflects the judicial "consensus . . . that the word 'exclusively' should not be interpreted literally if the purposes underlying income tax exemptions and charitable deductions were to be achieved." Id. at 795.

The government contends that the district court's interpretation disregards Treasury Regulation § 1.170A-9(c)(1)'s "merely incidental" limitation -- if noneducational activities can only be merely incidental, then educational activities must be predominant. As in the district court, the government relies on Malat v. Riddell, where the Supreme Court considered whether profits from real estate "held by the taxpayer primarily for sale to customers in the ordinary course of . . . business" should be treated as ordinary income or capital gains. 383 U.S. 569, 571-72 (1966). The Court ruled that "primarily" meant "of first importance" or "principally," adopting a literal reading of "primarily" to differentiate between the two possible tax treatments. Id. at 572. We agree with the district court that Malat is distinguishable.

-14-

An organization like Mayo can have more than one substantial function (medical education and patient care) and other noneducational functions such as its extensive administrative operations that are merely incidental to education.

We conclude that the district court did not err in its interpretation of "primary" in this context. Moreover, even if we adopted the government's interpretation of "primary," the district court was not foreclosed from finding, as it did, that Mayo's substantial patient care activities are not noneducational, given Mayo's careful integration of education and clinical practice. We agree with that finding. Thus, Mayo's patient care function need not be merely incidental to its educational offerings, as the government argues.

**B. Does Mayo Have a Substantial, Noneducational Purpose?** In Mayo I, we held that "the presence of a single non-educational purpose, if substantial in nature, will destroy the [UBIT] exemption regardless of the number or importance of truly educational purposes." 997 F.3d at 802, quoting Better Bus. Bureau, 326 U.S. at 283. The government argues that Mayo's nationwide hospital network and extensive patient care activities disqualify it from categorization as an educational organization because these functions represent a substantial, noneducational purpose. The government contends that the district court in concluding otherwise "sidestepped" the Supreme Court's decision in Better Business Bureau and Treasury Regulation § 1.170A-9(c)(1) as we upheld it in Mayo I. As the district court recognized, this is a difficult issue of first impression in this context.

The issue in Better Business Bureau was whether the Bureau was exempt from paying social security taxes because it was organized and operated exclusively for educational purposes. 326 U.S. at 280. The Supreme Court rejected the Bureau's contention that all of its activities were directed towards *educating* businesspeople and the public because there was a "commercial hue permeating" the organization. Closely examining the Bureau's corporate title, charter provisions, and activities, the

Court found it "apparent beyond dispute that an important if not the primary pursuit of [the] organization is to promote not only an ethical but also a profitable business community. The exemption is therefore unavailable." Id. at 283. The government asserts that because the district court found Mayo to have a substantial purpose of providing medical care to patients, Mayo is likewise disqualified from being designated an educational organization under IRC § 170(b)(1)(A)(ii). We disagree.

In Mayo I, we made clear that the fact that "some of its educational purposes and functions also fall within other charitable categories -- and vice versa -- would not disqualify [Mayo] from being an educational organization" unless a substantial, noneducational purpose exists, as in Better Business Bureau. 997 F.3d at 802. Based on its extensive findings of fact, the district court concluded that "[w]hile patient care is certainly [a] substantial [purpose,] it is not noneducational at Mayo." The court reviewed Tax Court and other judicial decisions recognizing that participating in patient care is integral to medical education and concluded:

> At trial, the evidence did not identify a "substantial" clinical practice function at Mayo that did not further the goal of providing training and education to the students at its colleges. In other words, statements emphasizing the importance of high-quality patient care at Mayo do not show that patient care is a substantial *noneducational* purpose of Mayo.

Our decision in Mayo I did not address this issue or foreclose concluding that a § 501(c)(3) charitable organization with a hybrid function that furthers another charitable purpose as well as education *can* still qualify as a § 170(b)(1)(A)(ii) "educational organization." What will disqualify the organization is if the other charitable purpose is substantial *and* unrelated to the organization's educational functions. That is a fact intensive inquiry.

The government does not challenge the district court's ultimate fact findings for clear error; it simply points to other findings suggesting, in the government's

-16-

view, that patient care is a substantial and noneducational purpose at Mayo. The district court acknowledged that the trial evidence supports finding that patient care is a substantial function at Mayo. But the weight of evidence supports the court's conclusion that patient care is not noneducational at Mayo.

In Better Business Bureau, the Bureau's efforts to root out dishonest business practices were "directed fundamentally to ends other than that of education." 326 U.S. at 284. Here, for more than a century, Mayo's careful integration of patient care and education has resulted in a patient care function that is not noneducational and therefore does not disqualify it from being an "educational organization" as defined in § 170(b)(1)(A)(ii), in applicable Treasury Regulations, and in the extensive legislative history describing the evolution of these complex income tax provisions. As Dr. Warner testified, Mayo's students are taught in the classroom and also "anywhere that there's patient care," from the operating room to the hallways.

We consider Living Faith, Inc. v. Commissioner an analogous case, where the Seventh Circuit considered the § 501(c)(3) tax-exempt status of a nonprofit corporation that operated vegetarian restaurants and health food stores in keeping with the doctrine of the Seventh-day Adventist Church. 950 F.2d 365, 367 (7th Cir. 1991). The court explained that "[a] single activity may be carried on for more than one purpose. The fact that an organization's primary activity may constitute a trade or business does not, of itself, disqualify it from classification under § 501(c)(3), provided the trade or business furthers or accomplishes an exempt purpose." Id. at 370. However, the court agreed with the Tax Court that the Living Faith organization was ineligible for tax-exempt status because its religious functions were "peripheral and incidental to the substantial commercial purpose of its restaurants and health food stores." Id. at 371-72 (quotation omitted). By contrast, Mayo has joined and integrated its noneducational patient care functions with its educational offerings.

The government points to <u>Redlands Surgical Services v. Commissioner</u>, in which the Tax Court, citing language from <u>Better Business Bureau</u> that we cited in <u>Mayo I</u>, held that a nonprofit corporation involved in the operation of an outpatient surgical center through a general partnership was not exempt under § 501(c)(3). 113 T.C. 47, 48-50, 71-72 (1999), <u>aff'd</u>, 242 F.3d 904 (9th Cir. 2001). "If the nonexempt purpose is substantial in nature, the organization will not satisfy the operational test." <u>Id.</u> at 71. However, the court did not reach the question whether an organization's substantial commercial purpose could be charitable in nature because in <u>Redlands</u>, the nonprofit corporation "ceded effective control of the . . . Surgery Center's activities to for-profit parties, conferring on them significant private benefits" and thus did not operate exclusively for a charitable purpose. <u>Id.</u> at 78. No for-profit party, including Mayo's employed physicians and surgeons, has effective control over Mayo's organization and operations.

The Tax Court's decision in <u>Dumaine Farms v. Commissioner</u>, 73 T.C. 650 (1980), also supports the district court's analysis of substantial overlapping purposes. In that case, a trust seeking exempt status under § 501(c)(3) operated an experimental model farm to "demonstrate to local farmers and the general public the economic feasibility of experimental farming practices which will conserve the area's ecology and native wildlife," and also sold the farm's crops and timber for profit. <u>Id.</u> at 652-53. Addressing "whether each substantial activity carried on is directed towards the accomplishment of one or more exempt purposes," the court held that the farm qualified for exempt status because all its activities "directly further its purposes of testing and demonstrating the economic feasibility of practicing environmental conservation theories on a working farm." <u>Id.</u> at 663-64. Though the farm carried on a commercial purpose by selling its crops, the purpose was "to demonstrate the commercial viability of petitioner's modern, ecologically sound farming techniques and alternatives to established cash crops," and the farm retained all profits to finance other conservation activities and connect with the public. <u>Id.</u> at 669. Thus, the farm's commercial, educational, and scientific functions did not defeat exempt status

-18-

because all served to advance the farm's exempt purposes. Here, the district court determined that the purpose of Mayo's allegedly noneducational patient care activities is to advance its educational purposes and they are therefore not noneducational. We agree this is a valid interpretation of the UBIT exemption at issue.

The government further argues that the district court disregarded the governing Treasury Regulations in holding that Mayo is an educational organization despite its substantial patient care purpose. The government emphasizes that Treasury Regulation § 1.170A-9(c)(1) states that "educational organization" as used in § 170(b)(1)(A)(ii) "does not include organizations engaged in both educational and noneducational activities unless the latter are merely incidental to the educational activities." But Treasury Regulation § 1.501(c)(3)-1(d)(3)(i) broadly states that the term "educational" relates to "[t]he instruction or training of the individual for the purpose of improving or developing his capabilities" or "[t]he instruction of the public on subjects useful to the individual and beneficial to the community." Subsection 1(d)(3)(ii) gives examples of educational organizations that include "[m]useums, zoos, planetariums, symphony orchestras, and other similar organizations."

In February 1969, the Associates of Mayo Clinic, which then employed over 400 physicians, surgeons, and medical scientists and treated approximately 200,000 patients each year, merged into the Mayo Foundation (Mayo's predecessor). In a letter ruling, the IRS determined that the Associates of Mayo Clinic "contribute[d] importantly" to the Foundation's "educational and scientific research purposes and is commensurate in size with those activities" and therefore the merger did not affect the Foundation's § 501(c)(3) status. This is strong if not conclusive evidence that Mayo's integrated medical education, patient care, and research missions comprise the type of "similar organization" encompassed by Treasury Regulation § 1.501(c)(3)-1(d)(3)(ii), which we held in Mayo I is the "proper frame of reference" for defining

-19-

the primary purpose and function of an "educational organization" in § 170(b)(1)(A)(ii). 997 F.3d at 800.

The district court found that patient care is a substantial purpose and function at Mayo, not one that is "merely incidental to the educational activities." Our decision in Mayo I did not foreclose the court from finding, based on extensive trial evidence, that in Mayo's fully integrated organization and operations the substantial patient care purpose and functions are *not* noneducational. Therefore, this is not a case where patient care is "an end in itself rather than merely a means of accomplishing a charitable goal." Senior Citizens Stores, Inc. v. United States, 602 F.2d 711, 714 (5th Cir. 1979). Patient care at Mayo cannot be completely detached from medical education. The district court's decision is not inconsistent with the governing regulations.

Finally, the government argues that Mayo is more appropriately categorized as a teaching hospital or medical research organization under § 170(b)(1)(A)(iii), to which § 514(c)(9)(C) does not extend the UBIT debt-financed real property exception, rather than a § 170(b)(1)(A)(ii) educational organization to which the exception does apply. The § 170(b)(1)(A) provisions limit the amount of an individual's deduction for charitable contributions in § 170(a) to "50 percent of the taxpayer's contribution base for the taxable year." Section 514(c)(9)(C) cross-references § 170(b)(1)(A)(ii) in defining a "qualified organization" to which the term "acquisition indebtedness" does not apply. The statute does not say that an organization may only qualify under one § 170(b)(1)(A) category, and the proposition is counterintuitive. The district court did not discuss the issue (if it was even presented), and the government cites no supporting authority. The district court concluded that Mayo is an "educational organization" under § 170(b)(1)(A)(ii). If that conclusion was sound, as we have concluded, that the court could have concluded that Mayo also qualifies for the limitation on charitable deductions in § 170(b)(1)(A)(iii) is simply irrelevant. Warning of a tax avoidance parade of

horribles, the government argues that the effect of the district court's "erroneous interpretation of § 170(b)(1)(A)(ii) is to except *all* academic medical centers and teaching hospitals operating in the United States from the reach of § 514's tax on debt-financed real property." But that assertion disregards the district court's thorough fact-based determination, based on an extensive trial record.

For the foregoing reasons, the judgment of the district court is affirmed.

GRASZ, Circuit Judge, concurring in the judgment.

Mayo I upheld Treasury Regulation § 1.170A-9(c)'s requirement that an organization qualifies as an "educational organization" for purposes of IRC § 170(b)(1)(A)(ii) only if its "primary function" is educational because "an 'educational organization' as used in § 170(b)(1)(A)(ii) must be 'organized and operated exclusively for . . . educational purposes.'" Mayo Clinic v. United States, 997 F.3d 789, 799–800 (8th Cir. 2021) (Mayo I) (ellipses in original) (quoting IRC § 170(b)(1)(A)(ii)). Therefore, since "primary function" acts as a stand-in for an organization's "exclusive" purpose, I do not believe the regulatory language can be stretched so far as to equate "primary" with "substantial." To do so defies plain English. It also contradicts our precedent, which directs us to "narrowly construe[]" tax exemptions. Storall Mfg. Co. v. United States, 755 F.2d 664, 665 (8th Cir. 1985). The metamorphosis of the qualification requirement from "primary" function to "substantial" purpose is not consistent with a narrow construction. Notably, to reach this result the court concludes that the reasoning of Board of Governors of Federal Reserve System v. Agnew, 329 U.S. 441 (1947), applies to this case. Ante, at 14. I do not find Agnew's reasoning persuasive because it reflects a purposive rather than textual approach to statutory construction. See ante, at 13 ("The [Agnew] Court . . . noted that interpreting primary to mean substantial was 'more consonant with the legislative purpose of the Banking Act.'" (quoting Agnew, 329 U.S. at 446–47)).

When this case was previously remanded to the district court, we directed the court to separate "the wheat from the chaff" in terms of Mayo's educational and non-educational purposes. <u>Mayo I</u>, 997 F.3d at 802. The district court undertook this task and decided all the potential chaff was actually wheat, finding Mayo's educational purposes were inextricably intertwined with its multi-billion-dollar network of patient care. While this finding may be debatable, it is not clearly erroneous. And the district court made the alternative finding that even "[i]f 'primary' meant 'most important,' [it] would still find [as fact] that Mayo's most important or principal purpose is education." Based on this alternative finding, I concur in affirming the district court.

_____